ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center
Newark, NJ 07102
Tel: (973) 776-1900
By:    Jeffrey D. Talbert, Esq.
        Benjamin S. Piper, Esq. (*Pro Hac Vice* pending)

*Common Counsel for Plaintiffs*
*(collectively, SPG Litigating Parties)*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| BASF CATALYSTS LLC, BASF CORPORATION, BENJAMIN MOORE & CO., CLEAN EARTH OF NORTH JERSEY, INC., COATS & CLARK INC., CONOPCO, INC., d/b/a UNILEVER BEST FOODS NORTH AMERICA, CRODA INC., ENPRO INDUSTRIES, INC., FRANKLIN-BURLINGTON PLASTICS, INC., GENERAL ELECTRIC COMPANY, GIVAUDAN FRAGRANCES CORPORATION, GOODRICH CORPORATION, HEXCEL CORPORATION, HOFFMANN-LA ROCHE INC., KALAMA SPECIALTY CHEMICALS, INC., LEEMILT'S PETROLEUM, INC., LEGACY VULCAN, LLC, (f/k/a VULCAN MATERIALS COMPANY, f/k/a KOLKER CHEMICAL CORPORATION), MALLINCKRODT LLC (f/k/a MALLINCKRODT, INC.), NAPPWOOD LAND CORPORATION, NATIONAL-STANDARD, LLC, NOVARTIS CORPORATION, OTIS ELEVATOR COMPANY, PARAMOUNT GLOBAL, PHARMACIA LLC, PPG INDUSTRIES, INC., PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC, (f/k/a TATE & LYLE INGREDIENTS AMERICAS LLC, | CIVIL ACTION NO.<br><br>**COMPLAINT** |

f/k/a A.E. STALEY MANUFACTURING          )
COMPANY), PUBLIC SERVICE ELECTRIC        )
AND GAS COMPANY, PURDUE PHARMA           )
TECHNOLOGIES, INC., QUALA SYSTEMS,       )
INC., QUALITY CARRIERS, INC., REWORLD    )
ESSEX COMPANY (f/k/a COVANTA ESSEX       )
COMPANY, (f/k/a AMERICA REF-FUEL         )
COMPANY OF ESSEX, A NEW JERSEY           )
GENERAL PARTNERSHIP AND ITS FORMER       )
AND CURRENT PARTNERS COVANTA             )
ESSEX LLC (f/k/a ARC ESSEX LLC AND       )
DUKE/UAE ESSEX LLC) AND COVANTA          )
ESSEX II, LLC (f/k/a COVANTA ESSEX II,   )
INC., ARC ESSEX II, INC. AND DUKE/UAE    )
ESSEX II, INC.))), RTC PROPERTIES, INC., )
SEQUA CORPORATION (n/k/a                 )
CHROMALLOY CORPORATION), STANLEY         )
BLACK & DECKER, INC., SUN CHEMICAL       )
CORPORATION, TEXTRON, INC., TFCF         )
AMERICA, INC., and THE OKONITE           )
COMPANY, INC.,                           )
                                         )
                                         )
              Plaintiffs,                )
                                         )
v.                                       )
                                         )
OCCIDENTAL CHEMICAL CORPORATION (a       )
Texas Corporation),                      )
                                         )
                                         )
              Defendant.                 )

Plaintiffs, who are all potentially responsible parties at the Diamond Alkali Superfund Site in New Jersey (the "Site"), collectively referred to herein as the Small Parties Group ("SPG") Litigating Parties, file this declaratory judgment action to prevent Occidental Chemical Corporation, a Texas corporation formed in 2025 ("OxyChem TX") from evading responsibility for Site clean-up costs and damages in contravention of the federal Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9628. Plaintiffs allege as follows:

## LOCAL CIVIL RULE 10.1 STATEMENT

1.      The mailing address and principal place of business for OxyChem TX is 14555 Dallas Parkway, Suite 400, Dallas, Texas 75254.

2.      The state of formation and principal place of business of each Plaintiff is shown in **Exhibit 1** hereto.

## INTRODUCTION

3.      The Site is one of the largest Superfund Sites in the United States. The environmental cleanup of the lower 17 miles of the Passaic River (the "Lower Passaic River"), which comprises two of the four operable units of the Site, is estimated to cost approximately $1.84 billion.

4.      A New York corporation named Occidental Chemical Corporation ("OxyChem NY"), was long-established to be the entity primarily responsible for the multi-billion-dollar environmental cleanup of the Site because its predecessors intentionally and illegally discharged 2,3,7,8-tetrachlorodibenzo-p-dioxin, one of the most toxic substances ever made, as well as several other contaminants of concern directly into the Lower Passaic River for almost two decades.

5.      In December 2020, a report (the "Allocation Recommendation Report") sponsored by the United States Environmental Protection Agency ("EPA") found that OxyChem NY was responsible for the vast majority of the Lower Passaic River environmental cleanup costs. In particular, the Allocation Recommendation Report found OxyChem NY's share of responsibility to range between 92% and 99.94%. The Allocation Recommendation Report was among the items considered in negotiations that led to a consent decree between the United States and dozens of

potentially responsible parties ("PRPs"), including many Plaintiffs, resolving their alleged liability for the Lower Passaic River. In December 2024, the United States District Court for the District of New Jersey entered the consent decree.

6. In addition to the Lower Passaic River, there will be response costs associated with the Newark Bay portion of the Site (estimated by the United States as up to $4.4 billion) and Natural Resource Damages (estimated by the United States as at least $5.5 billion).[1]

7. With the backdrop of these significant costs, OxyChem NY's corporate parent, Occidental Petroleum Corporation ("OPC"), implemented several internal corporate actions designed to limit or evade liability for these costs. In late 2025, OxyChem NY was dissolved after being merged into a newly formed Texas entity called Snowcone, LLC. Snowcone, LLC then changed its name to Occidental Chemical Company, LLC.

8. Occidental Chemical Company, LLC was then divided through a divisional merger under Texas law into (1) Environmental Resource Holdings, LLC ("ERH"), which was allocated no productive assets and purportedly all of OxyChem NY's extensive environmental liabilities; and (2) OxyChem TX, which was allocated OxyChem NY's productive assets and then sold to Berkshire Hathaway, Inc., the largest shareholder of OPC. ERH has claimed that it alone (and not also OxyChem TX) is now responsible for the liabilities of OxyChem NY.

9. This divisional merger bears hallmarks of the first step of the so-called "Texas Two-Step" by which entities facing significant liabilities seek to hamper creditors' recovery by using the Texas divisional merger statute to separate liabilities from productive assets.

10. CERCLA prohibits the use of such schemes to transfer liability. CERCLA Section

---

[1] *In re Maxus Energy Corp. et al.*, No. 16-11501 (Bankr. D. Del.), Am. Proof of Claim of the "United States on behalf of EPA, DOI and NOAA," at PDF pg. 91 (Apr. 15, 2021) ("Amended POC") (estimating future Newark Bay response costs of $22 million to $4.4 billion and Natural Resource Damages of at least $5.5 billion).

107(e)(1) makes private contractual transfers of CERCLA liability unenforceable. 42 U.S.C. § 9607(e)(1).

11.    As potentially responsible parties at the Site with pending claims against OxyChem NY, Plaintiffs are entitled to a declaratory judgment under 28 U.S.C. § 2201 that OxyChem TX is liable for OxyChem NY's CERCLA liabilities notwithstanding any purported contractual transfer or allocation of liabilities exclusively to another entity.

## **NATURE OF ACTION**

12.    This case concerns the latest chapter in a decades-long environmental catastrophe caused by OxyChem TX and its corporate predecessors: OxyChem TX's attempt to use Texas's divisional merger statute to avoid liability that courts, allocators, and EPA determined to have belonged to OxyChem NY, and which, by law, now belong to OxyChem TX as well.

13.    For over forty years, EPA and the New Jersey Department of Environmental Protection ("NJDEP") have endeavored to investigate and remediate the Site, a sprawling area of contamination emanating from OxyChem TX's former pesticides manufacturing plant in Newark, New Jersey, and extending to the entire Lower Passaic River and Newark Bay.

14.    The Site was added to the National Priorities List in 1984 as a consequence of OxyChem TX's corporate predecessors' deliberate and illegal discharges of chemical waste directly into the Lower Passaic River during their ownership and operation of the Diamond Alkali Plant at 80 and 120 Lister Avenue, Newark, New Jersey (the "Diamond Alkali Plant").[2]

15.    OxyChem TX's corporate predecessors have consistently been found responsible for discharging chemicals that have caused elevated hazardous contamination levels in the Lower

---

[2] *See, e.g., Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 447–49 (N.J. Super. Ct. App. Div. 1992) (*Aetna II*).

Passaic River, Newark Bay, and the surrounding watershed. Based on the United States' estimates, total future response costs for the Diamond Alkali Superfund Site could reach $6.2 billion or more.[3] In addition, the United States estimates Natural Resource Damages for the Site of at least $5.5 billion.[4]

16.    In recent years, two separate courts found OxyChem NY jointly and severally liable under CERCLA and New Jersey's state analogue, the New Jersey Spill Compensation and Control Act, N.J. Stat. Ann. §§ 58:10-23.11-.11f7, for all costs incurred in responding to discharges to the Lower Passaic River.

17.    In 2020, the Allocation Recommendation Report found OxyChem NY responsible for between 92% and 99.94% of the estimated $1.84 billion in remedial action costs for the Lower Passaic River. Many of the Plaintiffs subsequently entered a consent decree with the United States in which they settled their alleged Lower Passaic River liability for an aggregate $150 million.

18.    In December 2024, following an opportunity for public comment and over OxyChem NY's objections, the United States District Court for the District of New Jersey entered the consent decree. In doing so, the court effectively rebuffed OxyChem NY's repeated claims that it was not primarily responsible for Lower Passaic River cleanup costs. OxyChem NY has appealed that determination, and the appeal remains pending.

19.    In 2025, OxyChem NY and its affiliates undertook a corporate reorganization in which they endeavored to wall off OxyChem NY's valuable manufacturing assets from its multi-billion dollar "legacy" environmental liabilities, including those arising from the Site. OxyChem

---

[3] *See*, *United States v. Alden Leeds, Inc.*, No. 2:22-cv-07326 (D.N.J.), Dkt. 288-5, Declaration of Alice Yeh ("Yeh Decl.") ¶ 16 (estimating $1.38 billion cost of remedy for lower 8.3 miles of the Lower Passaic River), ¶ 17 (estimating $441 million cost of interim remedy for upper 9 miles of the Lower Passaic River); Amended POC at PDF pg. 91 (estimating future Newark Bay response costs of $22 million to $4.4 billion).
[4] Amended POC at PDF pg. 91.

TX was formed as a result of this reorganization, purportedly as the entity that holds OxyChem NY's chemical business and valuable manufacturing assets but not its liabilities.

20.     OxyChem NY and its affiliates achieved this purported corporate separation by undertaking a "divisional" or "divisive" merger under Texas state law.[5] First, OxyChem NY merged with and into a newly created Texas limited liability company named Snowcone, LLC ("Snowcone"), which then changed its name to Occidental Chemical Company, LLC. Occidental Chemical Company, LLC then executed a divisional merger pursuant to which it split into two entities: (1) OxyChem TX, which retained OxyChem NY's chemical manufacturing assets, and (2) Occidental Chemical Company, LLC, which was saddled with OxyChem NY's liabilities and changed its name to Environmental Resource Holdings, LLC ("ERH").

21.     A divisional merger under these circumstances is sometimes the first step of a "Texas Two-Step." The second step is usually some type of action, such as a bankruptcy filing, to further separate the valuable assets from the liabilities that the company is seeking to avoid. The Texas Two-Step has been implemented recently to ring-fence major tort liabilities, including harm from mesothelioma and asbestos, but with limited success.[6]

22.     Since the divisional merger, OxyChem NY's counsel has claimed in court filings that ERH holds the OxyChem NY environmental liabilities.[7]

23.     After purporting to separate its valuable assets from significant legacy

---

[5] The Texas Legislature codified divisional mergers in the Texas Business Organizations Code in 1989. Tex. Bus. Orgs. Code Ann. § 1.002(55).  The law was enacted to make Texas "a uniquely desirable jurisdiction in which to incorporate . . . and provide Texas corporations with unprecedented ability to effect 'spin-offs' and similar restructuring transactions through a simplified statutory process that is not available in other jurisdictions." H. Comm. On Bus. & Com., Bill Analysis, H.B. 472, 1989 Leg., 71st Reg. Sess., at 23.

[6] *See, e.g., In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023); *In re DBMP LLC*, No. 3:20-bk-33080 (Bankr. W.D.N.C. 2020); *In re Aldrich Pump LLC*, No. 3:20-bk-30608 (Bankr. W.D.N.C. 2020); *In re Bestwall LLC*, No. 3:17-bk-31795 (Bankr. W.D.N.C. 2017).

[7] *See United States v. Alden Leeds*, Nos. 25-1049, 25-1272 (3d Cir.), Dkt. 114.

environmental liabilities by divisional merger, OxyChem TX and its affiliates were not finished attempting to cordon off OxyChem NY's legacy environmental liabilities. In October 2025, OxyChem TX's then-parent, OPC, agreed to sell 100% equity in OxyChem TX in an all-cash transaction to Berkshire Hathaway, which agreed to pay $9.7 billion to another OPC subsidiary named Occidental Chemical Holding, LLC. Berkshire Hathaway is an insider of OPC, owning or controlling 30% of OPC's common stock, making it OPC's largest shareholder.

24.    The sale of OxyChem TX to Berkshire Hathaway closed on January 2, 2026.

25.    CERCLA Section 107(e)(1) precludes parties from transferring or otherwise allocating their CERCLA liabilities via conveyances such as a divisional merger:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

26.    Furthermore, under the express language of Texas Bus. Orgs. Code Ann. § 10.008(a)(4), efforts to allocate liabilities solely to one entity in a divisional merger must yield to other law, such as CERCLA Section 107(e)(1), precluding such allocation. And Texas Bus. Orgs. Code Ann. § 10.901 prohibits use of a divisional merger to abridge any right or rights of any creditor under existing laws.

27.    Plaintiffs are potentially responsible parties at the Site that have (a) received general notice letters from EPA identifying them as potentially responsible parties at the Site, (b) incurred response costs at the Site, (c) been named as defendants in OxyChem NY's pending claims for CERCLA cost recovery and contribution, and/or (d) paid to settle their Lower Passaic River liabilities to the United States. As a result, Plaintiffs possess existing and ongoing contribution rights and face exposure to additional response costs and enforcement actions at the Site. ERH's

8

position that it alone holds OxyChem NY's CERCLA liabilities at the Site materially affects Plaintiffs' contribution rights and exposure at the Site. Accordingly, Plaintiffs have a direct, substantial, and immediate interest in a judicial determination that, as a matter of law, OxyChem TX is also liable for OxyChem NY's CERCLA liabilities, notwithstanding any purported private contractual transfer or allocation of those liabilities to ERH.

28.      Plaintiffs, therefore, seek a declaratory judgment that any purported transfer or allocation of OxyChem NY's liability exclusively to ERH is precluded by CERCLA and that OxyChem TX is jointly and severally liable with ERH for OxyChem NY's CERCLA liabilities.

## **JURISDICTION AND VENUE**

29.      OxyChem TX is a "person" as that term is defined in 42 U.S.C. § 9601(21).

30.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, particularly 42 U.S.C. § 9607(e)(1).

31.      The Court has diversity jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity among the parties.

32.      This Court may declare the legal rights and obligations of the parties under 28 U.S.C. § 2201 because this action presents an actual controversy within the Court's jurisdiction.

33.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claims stated in this Complaint, including the alleged releases of hazardous substances and determinations of liability, occurred in this District, and the Lower Passaic River and most of Newark Bay are located within this District.

34. As alleged elsewhere herein, OxyChem TX has conducted activities in the State of New Jersey and has had sufficient contacts with the State of New Jersey to be subject to the jurisdiction of this Court.

## PARTIES

35. Exhibit 1 to this Complaint identifies Plaintiffs and their respective states of formation and principal places of business. None of the Plaintiffs is a citizen of Texas.

36. OxyChem TX is a corporation organized and existing under the laws of the State of Texas, with a principal place of business located at 14555 Dallas Parkway, Suite 400, Dallas, Texas, 75254. OxyChem TX holds the chemical business previously held by OxyChem NY before the above-described divisional merger.

37. OxyChem TX is a global manufacturer of commodity chemicals, with applications in water treatment, pharmaceuticals, healthcare and commercial and residential development.

38. OxyChem TX operates a manufacturing facility in Pedricktown, New Jersey.

39. OxyChem TX sells its products in the State of New Jersey.

## FACTUAL ALLEGATIONS

### Ownership and Operational History of the Diamond Alkali Plant[8]

40. From approximately 1945 through approximately 1969, OxyChem TX's corporate predecessors owned and operated the Diamond Alkali Plant located at 80 and 120 Lister Avenue, on the south bank of the Lower Passaic River at approximately river mile 3.2, *i.e.*, 3.2 miles from the mouth of the Lower Passaic River.

---

[8] The allegations in this section (Ownership and Operational History of the Diamond Alkali Plant) are largely drawn from facts determined by courts and EPA. *See Aetna II*; *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, No. C-3939-84 (N.J. Super. Ct. Ch. Div. Apr. 12, 1989) (*Aetna I*); EPA, *Record of Decision: Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site* (Mar. 3, 2016), https:semspub.epa.gov/work/02/396055.pdf; Yeh Decl.; *United States v. Alden Leeds, Inc.*, No. 2:22-cv-07326 (D.N.J.), Dkt. 288-7, Declaration of Michael Sivak.

41.     Among other things, the Diamond Alkali Plant produced herbicides and pesticides, including two now-banned chemicals: the deforestation chemical Agent Orange and the agricultural pesticide DDT. The Diamond Alkali Plant's manufacturing process for Agent Orange and other herbicides produced an extremely toxic form of the chemical dioxin, known as 2,3,7,8-tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD").

42.     EPA has determined that dioxin causes cancer and other adverse health effects at even extremely low levels and that 2,3,7,8-TCDD is the most toxic form of dioxin and by far the most toxic contaminant in the Lower Passaic River.

43.     OxyChem TX's corporate predecessors' discharges from the Diamond Alkali Plant are responsible for virtually all of the dioxin in the Lower Passaic River.

44.     Like the many other constituents used, produced, disposed, and released at and from the Diamond Alkali Plant and adjacent disposal areas, DDT and 2,3,7,8-TCDD are hazardous substances listed under CERCLA, 42 U.S.C. § 9601(14). Together, the hazardous substances released from the Diamond Alkali Plant are the drivers of the ecological and human health risks, the remedial and removal actions, and the cleanup and removal costs at the Site.

45.     OxyChem TX's corporate predecessors illegally and deliberately discharged massive quantities of dioxin, DDT, and other toxic chemicals *directly* into the Lower Passaic River through 1956 even though the facility had been ordered to connect to the sewer system.

46.     The Diamond Alkali Plant's management even consciously adopted a policy of "known violation" in order to cut costs; instead of modifying its manufacturing process to avoid discharging toxins directly into the Lower Passaic River, the Diamond Alkali Plant's management installed an alarm system to alert its employees when governmental regulatory inspectors were

coming so they could conceal the facility's direct discharge of toxins to the Lower Passaic River.[9]

47.    Thereafter, in pursuit of more profits, OxyChem TX's corporate predecessors rejected a modified manufacturing process by which the company could have at least reduced, if not eliminated, the generation and subsequent discharge of dioxins from the Diamond Alkali Plant.[10]

48.    OxyChem TX's corporate predecessors also misled regulators who came to the facility to investigate whether the entire Diamond Alkali Plant had been connected to a sewer system that would have reduced the release of toxins into the Lower Passaic River. In fact, OxyChem TX's corporate predecessors had purposefully *not* connected the building that generated dioxin.

49.    OxyChem TX's corporate predecessors continued to operate the Diamond Alkali Plant until August 1969, when the plant was sold and/or leased to Chemicaland Corporation ("Chemicaland"). OxyChem TX's corporate predecessors did not adequately dismantle or remediate the plant facilities, equipment, or lines that were contaminated with 2,3,7,8-TCDD and other hazardous substances prior to transferring ownership and operation to Chemicaland.

50.    From on or about November 22, 1976, until on or about February 24, 1977, OxyChem TX's corporate predecessors again assumed management and operation of the Diamond Alkali Plant. During that time, the plant continued to manufacture pesticides and herbicides. Additional and ongoing disposal and releases of 2,3,7,8-TCDD and other hazardous substances at and from the Diamond Alkali Plant and adjacent disposal areas continued during this period.

51.    The facilities, equipment, and lines left in place by OxyChem TX's corporate

---

[9] *Aetna I*, No. C-3939-84, at 9-10.
[10] *See Aetna II*, 609 A.2d at 462.

predecessors at the Diamond Alkali Plant continued to release hazardous substances into the Lower Passaic River at least into the 1980s.

## OxyChem Corporate Successorship Before 2025

52.    In 2011, the New Jersey Superior Court in the matter of *New Jersey Department of Environmental Protection v Occidental Chemical Corp.* entered a summary judgment in favor of NJDEP and the Administrator of the New Jersey Spill Compensation Fund on their assertion that OxyChem NY was successor by merger to the entities that owned and operated the Diamond Alkali Plant from the mid-1940s to 1969 and was liable for all cleanup and removal costs associated with those entities' discharges of hazardous substances. No. ESX-L9868-05, Order Partially Granting Plaintiffs' Motion for Partial Summary Judgment (July 19, 2011).

53.    On September 11, 2020, the United States District Court for the District of New Jersey ruled on a motion for partial summary judgment that OxyChem NY "is liable as a successor" to the entities that owned and operated the Diamond Alkali Plant from the mid-1940s to 1969.[11]

### Response Activities Resulting from Disposal and Releases of 2,3,7,8-TCDD and Other Hazardous Substances at the Diamond Alkali Plant and Adjacent Disposal Areas

54.    Downstream surface water flow and upstream tidal activity have transported wastes from the Diamond Alkali Plant, including 2,3,7,8-TCDD and other hazardous substances, widely throughout the Lower Passaic River, from the Dundee Dam into the Newark Bay Study Area.

55.    The releases and transport of wastes from the Diamond Alkali Plant, including 2,3,7,8-TCDD and other hazardous substances, throughout the Lower Passaic River resulted in EPA listing the Diamond Alkali Superfund Site on the National Priorities List in 1984.

56.    Response activities at the Diamond Alkali Superfund Site initially focused on the

---

[11] *Occidental Chem. Corp. v. 21st Century Fox Am., Inc.*, No. 2:18-cv-11273, Dkt. 1105 at 6 (D.N.J. Sept. 11, 2020).

high levels of 2,3,7,8-TCDD and other hazardous substances in the immediate vicinity of the Diamond Alkali Plant. Due to the widespread transport of 2,3,7,8-TCDD and other hazardous substances from the Diamond Alkali Plant and adjacent disposal areas, however, the Diamond Alkali Superfund Site has been expanded to include additional study areas. The Lower Passaic River Study Area (the "LPRSA") is the seventeen-mile tidal portion of the River from the Dundee Dam to Newark Bay. The LPRSA is also known as Operable Unit 4 ("OU4") and contains within it Operable Unit 2 ("OU2"), comprising the lower 8.3 miles of the River. The Newark Bay Study Area ("OU3") covers Newark Bay and portions of the Hackensack River, Arthur Kill and Kill Van Kull, and the areal extent of contamination (LPRSA and OU3 collectively, "Study Areas").

57.    EPA and the NJDEP have identified OxyChem NY as the party primarily responsible for releases at and throughout all Study Areas within the Diamond Alkali Superfund Site, and looked to OxyChem NY to either perform or pay for response activities to address the release of hazardous substances within the Diamond Alkali Superfund Site, including, but not limited to, the following:

    a.    1990 consent decree with the United States, under which OxyChem NY was required to implement the interim remedy for 80 and 120 Lister Avenue documented in a 1987 EPA Record of Decision.

    b.    1994 EPA administrative order on consent, under which OxyChem NY agreed to study the lower six-mile stretch of the Lower Passaic River. Based on the results of that investigation, EPA determined that the 17-mile stretch of the Lower Passaic River had been impacted by hazardous substances, and the LPRSA was expanded to include the entire 17-mile tidal portion of the Passaic River from the Dundee Dam to Newark Bay.

c.  2004 administrative order on consent, under which OxyChem NY agreed to perform the remedial investigation and feasibility study ("RI/FS") for the Newark Bay Study Area.

d.  2004 settlement agreement with EPA, under which OxyChem NY, as a member of a PRP group known as the Cooperating Parties Group ("CPG"), agreed to fund certain costs to perform the RI/FS of the LPRSA ("2004 RI/FS Agreement").

e.  2007 administrative settlement agreement and order on consent, under which OxyChem NY and other members of the CPG agreed to perform the RI/FS for the LPRSA ("2007 RI/FS ASAOC").

f.  2008 administrative order on consent ("2008 AOC"), under which OxyChem NY agreed to implement a removal of approximately 200,000 cubic yards of contaminated sediment from the Lower Passaic River near the Diamond Alkali Plant.

g.  2012 unilateral administrative order ("2012 UAO") issued by EPA to OxyChem NY, ordering OxyChem NY to participate in an action to remove approximately two feet of sediment from, and cap, a five-acre mudflat and point bar located on the eastern side of the Passaic River at river mile 10.9 containing particularly elevated levels of 2,3,7,8-TCDD and other hazardous substances from the Diamond Alkali Plant and adjacent disposal areas.

h.  2016 administrative settlement agreement and order on consent (the "2016 ASAOC"), under which OxyChem NY agreed to design the bank-to-bank dredge-and-cap remedy selected by EPA in a 2016 Record of Decision ("2016

ROD") to address the risks to human health and the environment posed by 2,3,7,8-TCDD, DDT, and other contaminants of concern in OU2, estimated to cost $1.38 billion.

i. 2023 unilateral administrative order (the "2023 UAO") issued by EPA to OxyChem NY, under which EPA ordered OxyChem NY to design the interim remedy for OU4 selected by EPA in a 2021 Record of Decision.

58.     Each order and agreement identified in Paragraph 57 is, by its terms, binding upon OxyChem NY's successors and assigns.

### OxyChem NY Litigation

59.     OxyChem NY initiated litigation alleging that many of the Plaintiffs are liable under CERCLA for the release or threatened release of hazardous substances at or in connection with the Site.

60.     More particularly, on June 30, 2018, OxyChem NY commenced *Occidental Chemical Corp. v. 21st Century Fox America, Inc.*, No. 2:18-cv-11273 (D.N.J.) ("*21st Century Fox*") against over one hundred parties, including most Plaintiffs. OxyChem NY's complaint sought cost recovery, contribution, and a declaratory judgment pursuant to CERCLA Sections 107(a) and 113(f) for response costs that OxyChem NY allegedly had incurred and may incur to remediate the Site.

61.     In 2019, the court dismissed certain claims. OxyChem NY's surviving claims in *21st Century Fox* are a CERCLA Section 107(a), cost recovery claim relating to the 2012 UAO; and CERCLA Section 113(f)(3)(B), contribution claims relating to (i) the 2008 AOC, (ii) 2011 Administrative Settlement Agreement and Order on Consent for Combined Sewer Overflow/Storm Water Outfall Investigation with EPA (the "2011 ASAOC"), and (iii) the 2016 ASAOC.

16

62.     In August 2019, many Plaintiffs filed counterclaims against OxyChem NY for contribution, cost recovery, declaratory judgment, and/or breach of contract for costs incurred and to be incurred at OU2 and OU4, including pursuant to the 2004 RI/FS Agreement, the 2007 RI/FS ASAOC, and a 2012 administrative settlement agreement and order on consent for the river mile 10.9 removal action. Many Plaintiffs amended their counterclaims in 2021 to, *inter alia*, add claims for breach of contract.

63.     Plaintiffs have outstanding CERCLA contribution and cost recovery claims against OxyChem NY for response costs incurred at the Site. OxyChem TX should now be subject to those claims and responsible for the share owed by OxyChem NY.

64.     On March 24, 2023, OxyChem NY commenced *Occidental Chemical Corp. v. Givaudan Fragrances Corp.*, No. 2:23-cv-01699 (D.N.J.) ("*Givaudan*") against a subset of parties in *21st Century Fox*, including numerous Plaintiffs, seeking cost recovery under CERCLA Section 107(a) for costs that OxyChem NY allegedly has and may incur under the 2023 UAO.

65.     On January 5, 2024, the United States District Court for the District of New Jersey stayed proceedings in *21st Century Fox* and *Givaudan* pending the adjudication of the United States' motion to enter a consent decree in a related action, *United States v. Alden Leeds, Inc.*, No. 2:22-cv-07326 (D.N.J.) ("*Alden Leeds*"). As of the filing of this Complaint, the consent decree proceedings in *Alden Leeds* are pending appeal and *21st Century Fox* and *Givaudan* remain stayed.

**The Consent Decree**

66.     In March 2016, EPA sent notifications to over 100 parties, including many Plaintiffs and OxyChem NY, asserting they were potentially responsible for OU2's contamination. EPA proposed to hire a third-party neutral under the Alternative Dispute Resolution (ADR) Act, 5 U.S.C. §§ 571-584, to perform an allocation, which would help EPA identify parties that could be

eligible for settlement based on their relative responsibility.

67.     Many of the Plaintiffs participated in the allocation. OxyChem NY, however, refused to participate in the allocation.

68.     A third-party allocation firm called AlterEcho conducted the allocation, using an EPA-approved process.

69.     After assembling an extensive record, AlterEcho issued a draft allocation recommendation report that proposed shares of responsibility for contamination of the Lower Passaic River.

70.     AlterEcho issued the final Allocation Recommendation Report in December 2020. The report grouped parties into five tiers based on their relative responsibility, with OxyChem NY alone in the first tier bearing 99.94% responsibility. The report also provided the results of an alternative allocation methodology, which again put OxyChem NY alone in the first tier and bearing 92% responsibility.

71.     With the Allocation Recommendation Report as a starting point, the United States and dozens of allocation participants began an eighteen-month, arm's-length settlement negotiation process.

72.     In 2022, the United States entered a consent decree with 82 settling parties, including many Plaintiffs, in which the settling parties agreed to make a $150 million cashout payment to resolve their alleged CERCLA liability for the Lower Passaic River.

73.     In December 2022, the government commenced *Alden Leeds*, filing a CERCLA complaint and lodging a proposed consent decree with the district court. Following the public notice and comment period, the government made several adjustments to the consent decree and filed a modified consent decree (the "CD") in January 2024. The settlement amount remained the

same in the modified CD.

74.     In December 2024, the district court in *Alden Leeds* entered the CD. Following extensive briefing, the court rejected OxyChem NY's objections to entry of the CD and held that the CD was "fair, reasonable, and consistent with CERCLA's goals."

75.     OxyChem NY appealed entry of the CD, and that appeal is currently pending before the United States Court of Appeals for the Third Circuit.

## The Corporate Reorganization

76.     In February 2025, OPC announced that its fourth quarter performance "was hurt by an 'environmental liability' because of a recent court ruling" and that its fourth quarter revenue of $6.84 billion "dropped 9% year over year and fell below estimates."[12]

77.     This decrease in profits was no doubt troubling for OPC's largest equity holder, Berkshire Hathaway, which holds a nearly 30% stake in OPC, the value of which would be significantly diminished by OxyChem NY's environmental liabilities.

78.     Shortly after the district court's ruling, OPC and its affiliates devised a scheme to separate OxyChem NY's assets from its massive liabilities for the Site cleanup.

79.     The scheme utilized Section 1.002(55)(A) of the Texas Business Organizations Code to effect a divisional merger, by which an existing company is split into two entities and the original company's assets and liabilities are contractually allocated amongst the two resulting entities. Where, as here, divisional mergers separate valuable assets from significant liabilities, such mergers are often the first step in the Texas Two-Step, a tactic known to be employed in attempts to shed major liabilities.

---

[12] Robert Stewart, *US operator's fourth quarter earnings hit by 'environmental liability,'* upstream (Feb. 18, 2025), https://www.upstreamonline.com/finance/us-operator-s-fourth-quarter-earnings-hit-by-environmental-liability-/2-1-1781600 (last visited Feb. 6, 2026) (indicating that "the order was related to a remediation settlement for chemical cleanups in New Jersey").

80.     As the first step in the reorganization, OPC subsidiary Occidental Chemical Holding, LLC formed Snowcone, a Texas limited liability company, on September 8, 2025.

81.     On September 26, 2025, OxyChem NY merged with and into Snowcone, and the resulting entity was named Occidental Chemical Company, LLC, a Texas limited liability company ("OCC Tex LLC").

82.     On September 29, 2025, OCC Tex LLC executed a divisional merger under Texas statute and split into two entities: (i) ERH, and (ii) OxyChem TX. Below is a diagram of the mergers:



83.     The New York Secretary of State's website indicates that OxyChem NY is now "Inactive" and "Merged Out of Existence."

84.     On October 2, 2025, OPC announced its agreement to sell OxyChem TX to Berkshire Hathaway, an insider, pursuant to a Purchase and Sale Agreement dated as of October 1, 2025, ("PSA") for $9.7 billion in cash.

85.     OPC stated that OxyChem NY's legacy environmental liabilities relating to the Site will be transferred to ERH and OPC subsidiary Glenn Springs Holdings, Inc. will manage existing remedial projects for that subsidiary.[13]

86.     Shortly after executing the divisional merger and the PSA, OxyChem NY's counsel filed a supplemental corporate disclosure statement (the "Supplemental Disclosure") in the *Alden Leeds* appeal stating that OxyChem NY "is now known as Environmental Resource Holdings, LLC."[14]

87.     In January 2026, ERH filed a reply brief in *Alden Leeds*, stating that ERH was "formerly Occidental Chemical Corporation."[15] ERH has not disclosed to the court in *Alden Leeds* that another entity—OxyChem TX—was also formerly OxyChem NY and has the same name and the same chemical business as OxyChem NY.

88.     OPC and its affiliates have concealed significant information regarding the sale to Berkshire Hathaway, the divisional merger, and related transactions. As set forth in OPC's Form 8-K dated October 1, 2025, OPC has relied on Item 601(b)(2) of SEC Regulation S-K to omit schedules and exhibits to the PSA from their public disclosures as confidential. Upon information and belief, those schedules and exhibits do not fit within the exception to Item 601(b)(2) because

---

[13] Joint Press Release, Berkshire Hathaway Inc. and OxyChem, Berkshire Hathaway Inc. to Acquire OxyChem (Oct. 2, 2025), www.oxy.com/news/news-releases/berkshire-hathaway-inc.-to-acquire-oxychem (last visited Feb. 6, 2026).
[14] *United States v. Alden Leeds*, Nos. 25-1049, 25-1272 (3d Cir.), Dkt. 114.
[15] *United States v. Alden Leeds*, Nos. 25-1049, 25-1272 (3d Cir.), Dkt. 118.

they are material and should have been publicly disclosed.

89.     Plaintiffs have endeavored to obtain information regarding OPC and OxyChem TX's transactions to no avail. The day after OxyChem NY's counsel filed the Supplemental Disclosure, Plaintiffs sought specific information from OxyChem NY's counsel to determine the real party in interest in *Alden Leeds*. That evening, OxyChem NY's counsel responded and refused to provide the requested information.

90.     On November 6, 2025, EPA sent information requests under CERCLA Section 104(e) to OPC, OxyChem TX, ERH, and other OPC affiliates seeking information regarding the divisional merger, the Berkshire Hathaway sale, and related transactions. *See* 42 U.S.C. § 9604(e). Upon information and belief, the recipients of EPA's requests continue to withhold material documents and information regarding the transactions in violation of EPA's Section 104(e) information requests and have otherwise claimed confidentiality over documents produced.

91.     On November 24, 2025, counsel for Plaintiff Public Service Electric and Gas Company ("PSE&G") requested information regarding whether the entities resulting from the divisional merger had the ability to meet OxyChem NY's obligations under a 2024 Administrative Settlement and Administrative Order on Consent ("ASAOC") relating to Operable Unit 2 of the Lower Hackensack River Superfund Site, to which Plaintiff PSE&G and OxyChem NY are parties, along with others. OxyChem TX refused to produce any of the requested information. Without any of the requested information, PSE&G, like the United States, cannot assess whether the entities resulting from the divisional merger have the ability to meet OxyChem NY's obligations under the Lower Hackensack Superfund Site ASAOC.

92.     The sale of OxyChem TX to Berkshire Hathaway closed on January 2, 2026.

93.     OxyChem NY's reorganization and related transactions foreseeably alter the

enforcement landscape under CERCLA by creating a material risk that responsibility for OxyChem NY's CERCLA obligations will be displaced onto others, including Plaintiffs. By purporting to transfer or allocate environmental liabilities exclusively to an entity that does not retain the assets or revenue-generating business of OxyChem NY, the transactions create an imminent risk that EPA or other claimants will be unable to obtain performance from the designated entity and will instead pursue other Site PRPs. That risk is neither speculative nor remote and gives rise to a present dispute regarding whether, as a matter of federal law, OxyChem NY's CERCLA liabilities could be transferred or allocated by private agreement solely to ERH in a Texas divisional merger.

94.    Federal law governs the application of successor liability under CERCLA. Because CERCLA Section 107(e)(1) precludes purported transfers of CERCLA liabilities by private agreement, both OxyChem TX and ERH are liable to the government and other third parties for OxyChem NY's CERCLA liabilities irrespective of any purported contractual transfer or allocation of liabilities through the divisional merger process. As a result of CERCLA Section 107(e)(1), the divisional merger of OxyChem NY created two liable entities (OxyChem TX and ERH) where there previously had been one (OxyChem NY).

<u>**COUNT I**</u>
**(Declaratory Judgment)**

95.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 94 above.

96.    An actual controversy exists within the meaning of 28 U.S.C. § 2201 between Plaintiffs and OxyChem TX concerning OxyChem TX's responsibility for CERCLA liabilities at the Site because OxyChem TX and its affiliates have undertaken a divisional merger that purports to transfer or allocate such liabilities exclusively to ERH in violation of CERCLA Section 107(e)(1). As PRPs at the Site that have incurred and continue to incur response costs and/or have

contribution rights, Plaintiffs are entitled to a judicial determination of OxyChem TX's ongoing CERCLA liability.

97.    It is well established by prior court orders and principles of corporate law that OxyChem NY was imbued with all of the environmental liabilities, including CERCLA liabilities, stemming from the ownership and operation of the Diamond Alkali Plant and the resulting generation and discharge of hazardous substances.

98.    OxyChem TX was formed when (i) OxyChem NY merged with a Texas limited liability company, with OCC Tex LLC as the surviving entity and (ii) then OCC Tex LLC divided itself into ERH and OxyChem TX.

99.    The only event purportedly separating OxyChem NY's chemical business assets from its environmental liabilities was the transfer or allocation of those assets and liabilities in the divisional merger process.

100.    The purported transfer or allocation of assets and liabilities in a divisional merger is accomplished via a contractual agreement called a plan of merger and is thus functionally and legally an attempt to divest liability through private contract.

101.    CERCLA Section 107(e)(1) expressly precludes such contractual divesting of liability. Under Section 10.008(a)(4) of the Texas Business Organizations Code, a plan of merger may not transfer or allocate liability solely to one entity if doing so would violate or conflict with federal law.

102.    As corporate successor to OxyChem NY, OxyChem TX is jointly and severally liable for OxyChem NY's CERCLA liabilities relating to the Diamond Alkali Plant irrespective of any purported contractual transfer or allocation of liabilities through the Texas divisional merger process.

WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that:

1.      Any purported transfer or allocation of OxyChem NY's CERCLA liability exclusively to ERH to the exclusion of OxyChem TX or any other entity is precluded by CERCLA;

2.      OxyChem TX is jointly and severally liable for OxyChem NY's CERCLA liabilities;

3.      Plaintiffs be awarded reasonable costs and attorneys' fees; and

4.      Granting such other or further relief as the Court deems just and proper.

Dated: February 6, 2026                Respectfully submitted,

                                       By:  /s/ Jeffrey D. Talbert

                                       **ARNOLD & PORTER KAYE SCHOLER LLP**
                                       One Gateway Center, Suite 1025
                                       Newark, NJ 07102-5322
                                       Jeffrey D. Talbert, Esq. (Bar #333512021)
                                       Benjamin S. Piper, Esq. (*Pro Hac Vice* pending)
                                       Tel: (973) 776-1900
                                       Jeff.Talbert@arnoldporter.com
                                       Benjamin.Piper@arnoldporter.com

                                       *Common Counsel for Plaintiffs*
                                       *(collectively, SPG Litigating Parties)*

## LOCAL RULE 11.2 CERTIFICATION

The undersigned hereby certifies, pursuant to 28 U.S.C. §1746, that the matter in controversy in the foregoing Complaint is related to the matters listed below in that they concern a similar subject matter and involve some of the same parties:

1.  *United States of America v. Alden Leeds, Inc., et al.*, No. 25-1272 in the United States Court of Appeals for the Third Circuit, on appeal from No. 2:22-cv-07326 in the United States District Court for the District of New Jersey.

2.  *Occidental Chemical Corporation v. 21st Century Fox America, Inc., et al.*, No. 2:18-cv-11273 in the United States District Court for the District of New Jersey.

3.  *Occidental Chemical Corporation v. Givaudan Fragrances Corp., et al.*, No. 2:23-cv-01699 in the United States District Court for the District of New Jersey.

4.  *In re Maxus Energy Corp.*, No. 16-11501 in the United States Bankruptcy Court for the District of Delaware.

 /s/ Jeffrey D. Talbert
Jeffrey D. Talbert, Esq.