MCDERMOTT WILD LLC
900 Haddon Ave., Suite 233
Collingswood, NJ 08108
Tel.   (856) 746-7962
By:   John J. McDermott, Esq.
        (jmcdermott@mcdermottwild.com)
        Lauren Krohn Wild, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.   (713) 650-8805
By:   Kathy D. Patrick, Esq.
        (kpatrick@gibbsbruns.com)
        Anthony N. Kaim, Esq.

*Attorneys for Defendant*
*Occidental Chemical Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| BASF CATALYSTS LLC, *et al.*, | )  ) Hon. Madeline Cox Arleo  ) Hon. Leda Dunn Wettre |
| Plaintiffs, | ) |
| v. | )  ) Civil Action No. 2:26-cv-01226 |
| OCCIDENTAL CHEMICAL CORPORATION, | )  ) |
| Defendant. | )  )  ) |

**NOTICE OF NEW SUPREME COURT DECISIONS
AS SUPPLEMENTAL AUTHORITY
IN SUPPORT OF MOTIONS TO DISMISS FILED BY
OCCIDENTAL CHEMICAL CORPORATION (TEXAS)**

OCC Texas moved to dismiss this action because the single declaratory judgment count in the Complaint rests on CERCLA Section 107(e), a statute that provides no private right of action. *See* ECF 16-1 at Part III and ECF 37 at 1-3. Defendant OCC Texas submits this notice of supplemental authority in support of that motion.

**I.    The Supreme Court's Recent Decisions in *FS Credit* and *Cisco Systems* are Binding and Dispositive Authority.**

On June 11, 2026, the Supreme Court decided *FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*, 608 U.S. ___ (2026). On June 23, 2026, the Court decided *Cisco Systems, Inc. v. Doe*, 609 U.S. ___ (2026). Though they addressed different statutes than CERCLA, both opinions are a sweeping rejection of the power of a court to imply rights of action under any statute.

The Court was emphatic in each, ruling that:

> Congress determines who may sue to enforce federal law. When Congress creates a private right of action, it usually does so expressly. … [W]e have since rejected the practice of fashioning rights of action as we see fit.

*FS Credit*, 608 U.S. ___ *slip op.* 3-4 (citations omitted); *see also Cisco Systems*, 608 U.S. ___ *slip op.* 9 ("[T]he power to create causes of action belongs to Congress…While our cases at one time permitted courts to provide redress if Congress remained silent, we have since rejected the practice of fashioning rights of action as we see fit. That is so because home-grown causes of action are difficult to

2

reconcile with the Constitution's separation of legislative and judicial power.") (citations omitted and cleaned up).

Plaintiffs' Complaint here alleges a single count declaratory judgment action, Compl. at Count I and pg. 25, which "presupposes the existence of a judicially remediable right." *Schilling v. Rogers,* 363 U.S. 666, 677 (1960). OCC Texas moved to dismiss it because CERCLA Section 107(e)—the statute the SPG alleges OCC Texas violated, Compl. at ¶¶96 and 101, and that the SPG admits "is the crux of this lawsuit," ECF 27 SPG Resp. at 27—creates no private right of action and is not a "judicially remediable right." *See* ECF 16-1 at Part III.[1]

*FS Credit* and *Cisco Systems* are binding and dispositive on this point. They shut the door on Plaintiffs' attempt to create a private right of action in CERCLA Section 107(e), Compl. at ¶¶96 and 101. In *FS Credit* the Supreme Court held that where the Investment Company Act "expressly permits shareholders and issuers of securities to enforce two of its provisions," a third provision in the same Act making certain contracts unenforceable did not "impliedly empower private parties" to bring suit under it. *FS Credit*, 608 U.S. ___ *slip op.* 1. "We have traditionally been reluctant to conclude that Congress implicitly created a private remedy in one

---

[1] OCC Texas also moved to dismiss interventions filed by other parties, whose interventions track the SPG's flawed Complaint and therefore fail to state a claim for relief. *See* ECF 37 at Part VI; ECF 23; ECF 30; ECF 39; ECF 41.

provision when it explicitly did so in another." *Id.* at 7-8. Just weeks later, in *Cisco Systems*, the Supreme Court reiterated:

> Since *Sosa* was decided, we have firmly committed to the view that judicially created causes of action offend the separation of powers in almost every circumstance. As a result, we have virtually eliminated the practice of fashioning them.

*Cisco Systems,* 609 U.S. ___ *slip op.* 10 (referring to *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).

Here, Congress provided private rights of action in CERCLA Section 107(a) and 113, but not in Section 107(e). ECF 16-1 at 27. Under *FS Credit* and *Cisco Systems*, that ends the matter. SPG's argument that its claim's elements "are those set out by the Declaratory Judgment Act *in conjunction with CERCLA Section 107(e)*…," ECF 27 SPG Resp. at 9 (emphasis added), fares no better. This amounts to private enforcement of the statute by another route, when Congress created no private right to enforce CERCLA Section 107(e) at all. ECF 16-1 at 22-23; ECF 37 at 1-2.

For these reasons, and those stated in its Motion to Dismiss, OCC Texas respectfully submits its Motions to Dismiss must be granted.

4

Dated: June 25, 2026                    Respectfully submitted,


                                        MCDERMOTT WILD LLC

                                By:    s/ John J. McDermott
                                        John J. McDermott, Esq.
                                        (jmcdermott@mcdermottwild.com)
                                        Lauren Krohn Wild, Esq.
                                        900 Haddon Ave., Suite 233
                                        Collingswood, NJ 08108
                                        Tel. (856) 746-7962

                                        GIBBS & BRUNS, LLP
                                        1100 Louisiana Street, Suite 5300
                                        Houston, TX 77002
                                        Tel. (713) 650-8805
                                        Kathy D. Patrick, Esq.
                                        (kpatrick@gibbsbruns.com)
                                        Anthony N. Kaim, Esq.

                                        *Attorneys for Defendant*
                                        *Occidental Chemical Corporation*

5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 25, 2026, a copy of Occidental

Chemical Corporation's Notice of Supplemental Authority was served on all counsel

of record via ECF.


Dated:  June 25, 2026                             By: s/ *John J. McDermott*
                                                       John J. McDermott, Esq.

6

(Slip Opinion)    OCTOBER TERM, 2025    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FS CREDIT OPPORTUNITIES CORP. ET AL. *v.* SABA CAPITAL MASTER FUND, LTD., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 24–345.   Argued December 10, 2025—Decided June 11, 2026

The Investment Company Act (ICA) comprehensively regulates investment companies.  The ICA designates the Securities and Exchange Commission as its primary enforcer and expressly permits shareholders and issuers of securities to enforce two of its provisions.  The question presented in this case is whether Section 47(b) of the ICA impliedly empowers private parties to sue for rescission of any contract that allegedly violates the Act.

Petitioners ("Funds") are investment companies that manage closed-end mutual funds.  These funds are "closed" because each contains a fixed number of shares issued at one time, and the price of each share is determined by trading on the open market.  Respondents Saba Capital Master Fund, Ltd., and Saba Capital Management, L. P., (collectively, Saba) engage in activist investing—a practice that involves identifying low-performing closed-end funds and purchasing a large enough stake to alter the funds' investment strategies.  The Funds are incorporated in Maryland, which has enacted the Maryland Control Share Acquisition Act (MCSAA), and have adopted resolutions opting into MCSAA provisions that limit voting rights for shareholders holding a disproportionate number of shares (like activist investors) unless other shareholders approve.  In June 2023, Saba sued the Funds, alleging that the Funds' resolutions violate the ICA's requirement that every share of stock shall be a voting stock with equal voting rights.  Saba's suit invoked Section 47(b) of the ICA, which provides that "a court may not deny rescission" of contracts that violate the ICA "at the instance of any party" unless the court finds that doing so would be consistent with equity and the ICA's goals.  15 U. S. C. §80a–46(b)(2).

Syllabus

The District Court held that Section 47(b) creates an implied private right of action to sue for contract rescission and granted Saba summary judgment.  The Second Circuit summarily affirmed.

*Held*: Section 47(b) of the ICA does not impliedly empower private parties to sue for rescission of contracts that allegedly violate the Act.  Pp. 3–10.

(a) Congress, not the Judiciary, decides who may enforce federal law; when Congress creates a private right of action, it usually does so expressly.  The Court has rejected the practice of fashioning rights of action, *Alexander* v. *Sandoval*, 532 U. S. 275, 287, because judicially created causes of action are difficult to reconcile with "'the Constitution's separation of legislative and judicial power,'" *Egbert* v. *Boule*, 596 U. S. 482, 491.  If a statute does not spell out a right of action, courts examine its text and structure to determine whether it implicitly provides one.

To create a private right, a statute must use "'rights-creating' language" aimed at protecting "'a particular class of persons.'" *Sandoval*, 532 U. S., at 288–289.  Language that "focus[es] on the person regulated rather than the individuals protected" does not suffice.  *Id.*, at 289.  And the existence of an express "remedial schem[e]" elsewhere in the statute may "foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights." *Id.*, at 290.  Pp. 3–4.

(b) Section 47 of the ICA—entitled "[v]alidity of contracts"—provides that any contractual waiver of compliance with the ICA "shall be void," §80a–46(a), and that contracts made in violation of the ICA are generally unenforceable unless specific circumstances are met, §80a–46(b)(1).  Relevant here, if such a contract "has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter." §80a–46(b)(2).

The phrase "rescission at the instance of any party" does not imply that private parties may sue.  Section 47(b) is a "mandate directed to . . . courts," rather than a provision that "confer[s] a right on a specified class of persons." *Thompson* v. *Thompson*, 484 U. S. 174, 183.  The key actor is a court, not an individual, §80a–46(b)(2), and it is instructed not to deny the remedy of rescission to parties who request it for performed contracts unless the equities and ICA's goals favor a different result, *ibid*.  Section 47(b)'s wording presupposes that parties are already before the court and directs the court's use of its remedial authority; it says nothing about individual rights.

Statutory structure points in the same direction.  The Securities and Exchange Commission bears primary responsibility for ensuring

Cite as: 608 U. S. \_\_\_ (2026)          3

Syllabus

compliance with the ICA and may investigate and bring enforcement actions in response to violations. §80a–41(a). Congress's decision to create a comprehensive agency enforcement scheme supports the conclusion that private parties generally cannot enforce the ICA. *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 94. Pp. 4–8.

(c) Saba's counterarguments are unpersuasive. The phrase "at the instance of any party" ordinarily means "at the solicitation" or "suggestion of," 7 Oxford English Dictionary 1040, directing a court's remedial power when a party before it is urging rescission; the phrase says nothing about conferring a right to sue in the first place. Saba's reliance on *Transamerica Mortgage Advisors, Inc.* v. *Lewis* (*TAMA*), 444 U. S. 11, which holds that the Investment Advisers Act (IAA) creates an implied right of action based on the phrase "shall be void," §80b–15(b), is unavailing because Congress amended Section 47(b) in 1980, deleting the "shall be void" language on which *TAMA*'s reasoning turns and shifting the focus toward regulating a court's remedial authority. Congress made these changes despite retaining the phrase "shall be void" in the immediately preceding provision, §47(a), and in the IAA itself. Changed language typically indicates changed meaning, and that is true here. Even if *TAMA* applied, it blesses only a "limited private remedy . . . to void an *investment advisers* contract," 444 U. S., at 24 (emphasis added); Saba would wield Section 47(b) to void *any* type of contract that violates the ICA. *TAMA* is thin support for such a sweeping right. Pp. 8–10.

Reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. KAGAN, J., filed a dissenting opinion. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined, and in which KAGAN, J., joined as to Parts I and II.

Cite as: 608 U. S. \_\_\_\_ (2026)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–345

FS CREDIT OPPORTUNITIES CORP., ET AL., PETITIONERS *v.* SABA CAPITAL MASTER FUND, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 11, 2026]

JUSTICE BARRETT delivered the opinion of the Court.

Congress, not the Judiciary, decides who may enforce the law. The Investment Company Act designates the Securities and Exchange Commission as its primary enforcer and expressly permits shareholders and issuers of securities to enforce two of its provisions. We must decide whether another provision of the Act impliedly empowers private parties to sue for rescission of any contract that allegedly violates the Act. The answer is no.

I

The Investment Company Act (ICA) comprehensively regulates investment companies. Petitioners, whom we will call the "Funds," are investment companies that manage closed-end mutual funds. These funds are called "closed" because they contain a fixed number of shares issued at one time. After shares are issued, capital does not regularly flow into the funds when investors buy shares, nor does it flow out when they sell. Instead, shares trade on the open market, which determines their price. Even though the net-asset value of the holdings may be lower due

2    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.
Opinion of the Court

to market fluctuations, long-term investors (like individuals saving for retirement) often favor closed-end funds.

Respondents Saba Capital Master Fund, Ltd., and Saba Capital Management, L. P., whom we will call "Saba," manage open-end mutual funds. Unlike their closed-end counterparts, open-end funds continually issue new shares to investors. These funds do not trade on the market and their shares are priced daily based on the net-asset value of the underlying holdings. Because capital continually flows into and out of these funds as trading occurs, they are highly liquid. Saba's investment strategy includes identifying low-performing closed-end funds and purchasing a large enough stake to change the funds' behavior. Brief for Respondents 17–18. Known as activist investing, this practice allows Saba to alter closed-end funds' investment strategies to make short-term profit or to convert them into open-end funds. Brief for Petitioners 11; *Saba Capital CEF Opportunities 1, Ltd.* v. *Nuveen Floating Rate Income Fund*, 88 F. 4th 103, 108 (CA2 2023).

To avoid activist-investor takeovers, closed-end funds generally incorporate in jurisdictions with laws that favor them. The Funds are incorporated in Maryland, which has enacted the Maryland Control Share Acquisition Act (MCSAA). The MCSAA limits voting rights for shareholders holding a disproportionate number of shares (like activist investors) unless other shareholders approve. See Md. Corp. & Assns. Code Ann. §3–702(a)(1) (2026). In this way, it prevents rapid shifts in fund control. The Funds have adopted resolutions opting into the MCSAA.

In June 2023, Saba sued the Funds over those resolutions. Saba alleged that they violate the ICA's requirement that "every share of stock . . . shall be a voting stock and have equal voting rights with every other outstanding stock." 15 U. S. C. §80a–18(i). For a right of action, Saba invoked Section 47(b) of the ICA. That section provides that "a court may not deny rescission" of contracts that violate

Opinion of the Court

the ICA "at the instance of any party" unless the court finds that doing so would be consistent with equity and the ICA's goals. §80a–46(b)(2).

The District Court, following the Second Circuit's decision in *Oxford University Bank* v. *Lansuppe Feeder, LLC*, 933 F. 3d 99 (2019), held that Section 47(b) creates an implied private right of action to sue for contract rescission and granted Saba summary judgment. The Second Circuit summarily affirmed. We granted certiorari to resolve a circuit split over whether Section 47(b) contains an implied private right of action.[1]  606 U. S. 930 (2025).

## II

Congress determines who may sue to enforce federal law. *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 579 (1979); *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001).  When Congress creates a private right of action, it usually does so expressly.  For example, "[a] person whose religious exercise has been burdened in violation of [the Religious Freedom Restoration Act] may assert that violation as a claim or defense in a judicial proceeding."  42 U. S. C. §2000bb–1(c).  A "person aggrieved" by discrimination may "institut[e]" a "civil action for preventative relief."  §2000a–3(a).  And so on.

Private litigants sometimes sue to enforce statutes that lack comparable language.  At one point in time, the Court stood ready to let them; it reasoned that courts should "be alert to provide such remedies as are necessary to make effective the congressional purpose" underlying a statute.  *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 433 (1964).  But we have since rejected the practice of fashioning rights of

---

[1] Compare *Oxford Univ. Bank*, 933 F. 3d, at 105, with *Santomenno ex rel. John Hancock Trust* v. *John Hancock Life Ins. Co. (U. S. A.)*, 677 F. 3d 178, 186–187 (CA3 2012); *Steinberg* v. *Janus Capital Mgmt., LLC*, 457 Fed. Appx. 261, 267 (CA4 2011) (*per curiam*); *UFCW Local 1500 Pension Fund* v. *Mayer*, 895 F. 3d 695, 699–701 (CA9 2018).

action as we see fit. *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 170 (1994); *Sandoval*, 532 U. S., at 287. Home-grown causes of action are difficult to reconcile with "the Constitution's separation of legislative and judicial power." *Egbert* v. *Boule*, 596 U. S. 482, 491 (2022) (internal quotation marks omitted). Rather than augmenting statutes, we interpret them. If a statute does not spell out a right of action, we examine the statute's text and structure to determine whether it implicitly provides one.

To create a private right, a statute must use "rights-creating language" aimed at protecting "a particular class of persons." *Sandoval*, 532 U. S., at 288–289 (internal quotation marks omitted); *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 284 (2002) (statutes create private rights when they are "'phrased in terms of the persons benefited'"). Language that "focus[es] on the person regulated rather than the individuals protected" does not fit the bill. *Sandoval*, 532 U. S., at 289. And language establishing an express "remedial schem[e]" elsewhere in the statute may "foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights." *Id.*, at 290; *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13–14 (1981) (existence of "elaborate enforcement provisions" forecloses the "implication [of] additional judicial remedies"). So we also examine whether Congress has provided other mechanisms for enforcing the provision at issue. *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 93–94 (1981).

With this framework in mind, we turn to the ICA. Section 47—entitled "[v]alidity of contracts"—contains two parts. The first provides that any contractual waiver of compliance with the ICA "shall be void." 15 U. S. C. §80a–46(a). The second provides that contracts made in violation of the ICA are "unenforceable by either party . . . unless a court finds that under the circumstances enforcement

Cite as: 608 U. S. ____ (2026)          5

Opinion of the Court

would produce a more equitable result . . . and would not be inconsistent with the purposes of this subchapter." §80a–46(b)(1). And if such a contract "has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter." §80a–46(b)(2). The question is whether the phrase "rescission at the instance of any party" implies that private parties may sue. It does not.

Section 47(b) is a "mandate directed to . . . courts," rather than a provision that "confer[s] a right on a specified class of persons." *Thompson* v. *Thompson*, 484 U. S. 174, 183 (1988); cf. *Sandoval*, 532 U. S., at 289 (provision "'phrased as a directive to federal agencies'" does not create a private right or remedy). The key actor is "a court," not an individual. §80a–46(b)(2). And a court is told that it "may not deny" the remedy of rescission to parties who request it for performed contracts unless the equities and statutory purposes favor a different result. *Ibid.* Section 47(b)'s wording thus presupposes that parties are already before the court and directs the court's use of its remedial authority. It says not a word about individual rights.

It bears emphasis that contract law treats rescission as a remedy, not a cause of action. See H. Black, Rescission of Contracts and Cancellation of Written Instruments §1 (1916) (Black). Suits seeking rescission end up before courts in various ways. A party to a contract may bring an action under state law—say, for breach of contract—and ask the court to undo the contract. See 26 R. Lord, Williston on Contracts §68:22 (4th ed. 2019). Or she may seek rescission when raising an affirmative defense such as fraud, mistake, or duress in a breach-of-contract suit. See 27 *id.*, §69:48 (2020); Brief for United States as *Amicus Curiae* 19. Or a nonparty, such as a shareholder, may seek rescission alleging that corporate officers violated their fiduciary

6    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.

Opinion of the Court

duties. §80a–35(b). Regardless, other sources of law typically supply the right of action in suits requesting rescission.[2]

Section 47(b)'s function underscores the provision's focus on a court's remedial power. The common law makes it difficult to obtain rescission if a contract has been performed. If a contract formed in violation of a statute "has been fully executed on the part of the plaintiff," then neither "a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract." *St. Louis, V. & T. H. R. Co.* v. *Terre Haute & Indianapolis R. Co.*, 145 U. S. 393, 407–408 (1892); Black §313; see 15 W. Jaeger, Williston on Contracts §1787 (3d ed. 1972). In that circumstance, the common law denies rescission and leaves the parties "where their own acts have placed them." Black §313; see also *id.*, §318 (discussing rescission in the context of contracts formed in violation of statutes); Restatement (First) of Contracts §598 (1932) (similar). Section 47(b) deviates from that common-law rule by instructing that courts "may not deny rescission" on the basis that a contract has been performed. By overriding the common-law default, it unlocks remedies that would otherwise be unavailable. It does not create a cause of action.

Statutory structure points in the same direction. As the principal dissent concedes, *post*, at 10 (opinion of JACKSON, J.) (hereinafter the dissent), the Securities and Exchange Commission bears primary responsibility for ensuring

───────────

[2] Insisting that rescission signals a cause of action, the dissent quotes from Black's treatise, which states that "'a party . . . *may invoke the aid of a court of equity* and obtain a decree for . . . rescission.'" *Post*, at 9 (opinion of JACKSON, J.) (quoting Black §1). Elsewhere, however, the treatise explains that a party may obtain equitable rescission only if "he is able to show the existence of some well-recognized title to equitable relief, such as fraud, mistake, or duress." *Id.*, §14. Consistent with our view, then, the treatise frames rescission as a remedy that may be granted to a party with an underlying claim in equity.

Opinion of the Court

compliance with the ICA. It may investigate and bring enforcement actions in response to violations of "any provision of [the ICA] or of any rule, regulation, or order" issued under the Act. §80a–41(a). It may also "bring an action in . . . court" for injunctive relief or civil monetary penalties. §§80a–41(d), (e). Congress's decision to create a comprehensive agency enforcement scheme supports the conclusion that private parties generally cannot enforce the ICA. *Northwest Airlines, Inc.*, 451 U. S., at 94; see *Karahalios* v. *Federal Employees*, 489 U. S. 527, 533 (1989). Put differently, "[t]he express provision of one method of enforc[ement] . . . suggests that Congress intended to preclude others." *Sandoval*, 532 U. S., at 290 (collecting cases); *Gonzaga Univ.*, 536 U. S., at 289 (reasoning that because the Secretary of Education is authorized to enforce the Family Educational Rights and Privacy Act of 1974, it does not create privately enforceable rights).

While the Securities and Exchange Commission is the ICA's main enforcer, the Act also expressly authorizes two private rights of action. Since 1970, the ICA has allowed security holders to sue investment advisers for breaches of fiduciary duty. §80a–35(b) ("An action may be brought . . . by a security holder of [a] registered investment company on behalf of such company" for breach of fiduciary duty against certain members of the company). This provision also details how the right of action should operate: It assigns burdens of proof, caps damages, and specifies a forum. *Ibid.* The ICA also incorporates an express right of action from the Securities Exchange Act, which allows an issuer of securities to recover certain short-term profits realized by a regulated individual. §80a–29(h) (incorporating §78p(b), which permits "[s]uit to recover" such profits). These provisions demonstrate that "when Congress wished to provide a private . . . remedy" to enforce the ICA, "it knew how to do so and did so expressly." *Touche Ross & Co.*, 442 U. S., at 572. We have traditionally been reluctant to conclude

8    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL MASTER FUND, LTD.

Opinion of the Court

that Congress implicitly created a private remedy in one provision when it explicitly did so in another. See *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 20, and n. 10 (1979) (*TAMA*) (reasoning that because one provision of the ICA authorizes private lawsuits for damages, we should not imply a private right of action for that relief elsewhere). So too here.[3]

In sum, nothing in the text or structure of the ICA indicates that Congress authorized private parties to enforce virtually every provision in the statute. For a cause of action to exist, we would have to create it. And having "sworn off the habit" of implying private rights of action, "we will not accept [Saba's] invitation to have one last drink." *Sandoval*, 532 U. S., at 287.

## III

Saba's counterarguments, while not without force, are ultimately unpersuasive. As for text, it points out that Section 47(b) also includes the phrase "at the instance of any party." Brief for Respondents 23–26. According to Saba, this language displays Congress's intent to create a private right of action. But the ordinary meaning of "*at the instance of* (a person)" is "at the solicitation" or "suggestion of." 7 Oxford English Dictionary 1040 (2d ed. 1989). And "instance," when used as verb, means "[t]o urge." *Ibid.*; see also Webster's New International Dictionary 1287 (2d ed. 1954) ("[t]o urge; importune"). The legal meaning of "instance" is the same. See, *e.g.*, Black's Law Dictionary 947 (12th ed. 2024) ("[u]rgent solicitation or insistence"); 2 Bouvier's Law Dictionary 1604 (8th ed. 1914) ("urging"). So the phrase "a court may not deny rescission at the instance of any party" is most naturally read to direct a court's

_____

[3] The dissent claims that the ICA's express causes of action authorize "damages, not rescission." *Post*, at 11 (emphasis deleted). But §80a–35(b)(3) references both "damages or other relief" and nowhere states that rescission is unavailable.

Opinion of the Court

remedial power when a party before it is urging rescission. §80a–46(b)(2). It says nothing about conferring a right to sue in the first place.

Saba puts most of its chips on *TAMA*, which holds that Section 215 of a different statute—the Investment Advisers Act (IAA)—creates an implied right of action. 444 U. S., at 18. Section 215 provides that contracts whose formation or performance violates the IAA "shall be void." 15 U. S. C. §80b–15(b). *TAMA* reasons that "[b]y declaring certain contracts void, §215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere." 444 U. S., at 18. According to *TAMA*, someone "with the power to void a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid." *Ibid.*; see *id.*, at 19 (Congress's use of "void" indicates that "customary legal incidents of voidness would follow, including the availability of a suit"). Thus, *TAMA* holds that Section 215 of the IAA contains an implied private right of action to "void [an] investment advisers contract." *Id.*, at 19, 24.

As originally enacted, Section 47(b) of the ICA mirrored Section 215 of the IAA. 54 Stat. 846 (every contract made or performed in violation of the ICA "shall be void"). So under *TAMA*, Saba says, Section 47(b) likewise contains a cause of action. Case closed.

If this were 1979, the year that *TAMA* was decided, then Saba would have a point. But as even the dissent grudgingly admits, *post*, at 7–8, something important happened in 1980: Congress amended the ICA and entirely reworked Section 47(b). Relevant here, it added references to the key actor—"'a court.'" 94 Stat. 2277. And Congress deleted the language that contracts formed in violation of the ICA "shall be void" and replaced it with two distinct phrases. The first states that contracts violating the ICA are "'unenforceable by either party,'" and the second provides that if

one of those contracts has been performed, "a court may not deny rescission." *Ibid*.[4]

Saba tries to use the amendment to its advantage: It argues that Congress simply made the right of action *TAMA* recognizes "explicit" by inserting the term "rescission." Brief for Respondents 33–34. In other words, the edit was clarifying rather than substantive. But changed language typically indicates changed meaning. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 256 (2012). And the changes here are significant. Most importantly, Congress deleted the "shall be void" language on which *TAMA*'s reasoning turns and shifted the focus to regulating a court's remedial authority. 94 Stat. 2277. Congress made these changes despite retaining the phrase "shall be void" in the immediately preceding provision, Section 47(a). Likewise, it did not remove the "shall be void" language in the IAA, even though it made other changes to that statute. *Id.*, at 2289–2291. So what Saba portrays as a clarifying edit actually *distinguishes* Section 47(b) of the ICA from Section 215 of the IAA. The 1980 amendments were a renovation, not a new coat of paint.

Given the textual differences between Section 47(b) and Section 215, *TAMA* does not get Saba far. And to be clear, Saba would take *TAMA* far indeed. *TAMA* blesses only a "limited private remedy . . . to void an *investment advisers* contract." 444 U. S., at 24 (emphasis added). Saba finds something much larger hiding in congressional silence: It would wield Section 47(b) to void *any* type of contract that violates the ICA. *TAMA* is thin support for such a sweeping right.

―――――――

[4] The dissent faults us for disregarding the statutory and legislative history of Section 47(b). *Post*, at 1, 13–22. As for the latter: guilty as charged. But the accusation is perplexing with respect to the former, because statutory history is precisely what we consider here.

Cite as: 608 U. S. ____ (2026)  11

Opinion of the Court

IV

In the dissent's view, the key to this case lies in two Committee Reports expressing Congress's "'wish'" that courts liberally imply private rights of action. *Post*, at 1. The dissent repeatedly faults us for failing to consider these Reports, and broadly attempts to defend the use of legislative history in interpreting statutes. *Post*, at 1, 11–22. Its efforts do not just fail—they backfire.

Notably, the dissent does not use the Committee Reports to clarify the meaning of Section 47(b). For instance, the dissent does not consult the Committee Reports to see how their authors used the words on which this case turns: "rescission at the instance of any party." Nor does it try to identify the circumstances that prompted Congress to retool Section 47(b). Instead, the dissent uses the Reports on a mission impossible: divining how Congress would have wanted courts to resolve the question presented in this case. Its theory depends on the fictional premise that hundreds of legislators (not to mention the President) shared a unified private view of how the statute should apply in a contested circumstance. See F. Easterbrook, Statutes' Domains, 50 U. Chi. L. Rev. 533, 547−548 (1983); K. Shepsle, Congress Is a "They," Not an "It": Legislative Intent as Oxymoron, 12 Int'l Rev. L. & Econ. 239, 241–244, 249 (1992).[5] Worse, it violates the fundamental precept that "[w]e are governed by laws, not by the intentions of legislators." *Conroy* v. *Aniskoff*, 507 U. S. 511, 519 (1993) (Scalia, J., concurring in judgment).

―――――――
[5] The dissent responds that "it is hard to take th[is] criticism seriously" because *all* statutory interpretation seeks to discern Congress's intent. *Post*, at 19. But rather than trying to unearth Congress's "actual intent," *post*, at 1, courts look for "'objectified' intent"—the intent that a reasonable person would gather from the text of the law. A. Scalia, A Matter of Interpretation: Federal Courts and the Law 17 (1997). Put differently: The judicial task is to read words, not minds.

Even assuming that Congress's subjective intent were knowable and controlling, the dissent fails to deliver. Far from demonstrating the value of legislative history, the dissent models its misuse.

The classic criticism of using legislative history is that it is "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Ibid.* True to form, the dissent navigates around unwelcome guests. The most relevant portions of the Reports are those addressing Section 47(b)—which is, after all, the provision we are interpreting. But the dissent ignores these sections altogether, presumably because they undercut its argument. In its discussion of Section 47(b), the House Report nowhere mentions a private right of action. Instead, it states that the 1980 amendment "embodies a general revision . . . and is designed to provide clearer statutory guidance in interpreting that equitable rescission *remedy*." H. R. Rep. No. 96–1341, p. 27 (1980) (H. R. Rep.) (emphasis added). The Senate Report contains the same language. S. Rep. No. 96–958, p. 10 (1980) (S. Rep.). Rather than treating the amended provision as a right of action, both sections confirm the obvious point that rescission is a remedy. And their references to "clearer statutory guidance in interpreting" Section 47(b) support treating the provision as a directive to courts—the typical interpreters of statutes—about how to handle cases already before them.

While ignoring these sections, the dissent takes creative license with others. It confidently assures the reader that there is "legislative history containing an explicit statement from Congress imploring 'courts to imply private rights of action under' the amended Section 47(b)." *Post*, at 13. There is no such statement. The paragraph that the dissent cites in the Senate Report, *post*, at 6, 12, 13, speaks of implying causes of action in the "federal securities laws" generally, not the ICA specifically. S. Rep., at 14. The cited House Report pages, *post*, at 6, 12, 13, are similar. H. R.

Opinion of the Court

Rep., at 28–29. In fairness to the dissent, these paragraphs reference the ICA in passing—but not Section 47(b). The Senate Report says that courts should imply causes of action "to the same extent that such causes of action are implied under the Investment Company Act." S. Rep., at 14. And the House Report expresses the Committee's expectation that "[i]n appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under *Section 36(a)* of the Investment Company Act." H. R. Rep., at 29 (emphasis added). These Committee Reports do not, as the dissent claims, "unequivocally expres[s]" Congress's desire that courts imply causes of action under Section 47(b) of the ICA. *Post*, at 1; see also *post*, at 12 (claiming that "a clearer expression of legislative intent" has "seldom [been] seen").

At most, the dissent's citations show that members of the House and Senate Committees wanted courts to imply causes of action in some unidentified provisions of the securities laws. But even if committee members would have put Section 47(b) on that list, what should we make of it? The House Report notes disapprovingly that "in recent years, the Supreme Court [has] turned its focus toward a strict construction of statutory language and expressed intent." H. R. Rep., at 28. It then bemoans the Court's unwillingness to imply causes of action and criticizes the Court for declining to imply a damages remedy in *TAMA*. H. R. Rep., at 28–29, n. 6. One wonders: If the House Committee wanted to authorize private remedies and knew that the Court would be reluctant to imply them, why did it not make them express? Were members of the House Committee uncertain whether express causes of action would win approval from a majority of the House, a majority of the Senate, and the President? Cf. J. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2417 (2003) (Manning); A. Gluck & L. Bressman, Statutory Interpretation From the Inside—An Empirical Study of Congressional Drafting,

14       FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
                  MASTER FUND, LTD.
                  Opinion of the Court

Delegation, and the Canons: Pt. I, 65 Stan. L. Rev. 901, 973–974 (2013). Did they worry that authorizing private remedies might undo compromises that enabled the bill to cross the finish line? Manning 2411–2412, 2417. There is no way to know. Congress expresses itself as a body through the text it enacts; the views of the 42-member House Committee on Interstate and Foreign Commerce and of the 15-member Senate Committee on Banking, Housing, and Urban Affairs are not the law. See Congressional Directory, 96th Cong., 1st Sess. 301 (1979); S. Rep., at II.

At bottom, the dissent hopes to revive that old-time devotion to legislative history. See, *e.g.*, *Church of Holy Trinity* v. *United States*, 143 U. S. 457, 464–465 (1892). Instead of winning converts, however, the dissent illustrates why statutory interpretation must focus on the text—or, to borrow from Justice Robert Jackson, why interpretation must be driven by "analysis of the statute" rather than "psychoanalysis of Congress." *United States* v. *Public Util. Comm'n of Cal.*, 345 U. S. 295, 319 (1953) (concurring opinion).

*     *     *

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 608 U. S. \_\_\_\_ (2026)          1

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 24–345

———————

FS CREDIT OPPORTUNITIES CORP., ET AL.,
PETITIONERS *v*. SABA CAPITAL MASTER
FUND, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 11, 2026]

JUSTICE KAGAN, dissenting.

My views about the proper use of legislative history in statutory interpretation fall someplace in between the majority's and the principal dissent's. The one-sentence version is: Reliance on legislative history may be appropriate when statutory text in context remains, after careful review, stubbornly ambiguous. I do not find Section 47(b) to exhibit such a lack of clarity. For the reasons JUSTICE JACKSON gives in Parts I and II of her dissenting opinion, the text, structure, and statutory history of Section 47(b) support recognition of a private right of action. I therefore gladly join those parts of JUSTICE JACKSON's dissent, while abstaining from the opinions' further debate about the meaning of the House and Senate Reports.

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–345

_____

FS CREDIT OPPORTUNITIES CORP., ET AL., PETITIONERS *v.* SABA CAPITAL MASTER FUND, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 11, 2026]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, and with whom JUSTICE KAGAN joins as to Parts I and II, dissenting.

I agree with the Court that "Congress, not the Judiciary, decides who may enforce the law." *Ante*, at 1. It is for that very reason that I think courts should consult all reliable indicia of Congress's intent when interpreting its statutes. Had the Court done so here, it would have acknowledged that Congress amended Section 47(b) of the Investment Company Act in reliance on a prior decision of ours that had interpreted the original text to contain an implied private right of action for rescission. It would also have wrestled with legislative Committee Reports that unequivocally expressed Congress's "wish" that the statute continue to be interpreted to allow private suits, notwithstanding this Court's increasing penchant for refusing to recognize implied rights of action.

The majority today misreads the text of Section 47(b). It also deftly sidesteps compelling evidence of Congress's actual intent and opts instead to draw inferences about Congress's objectives. In so doing, the majority assumes for itself the prerogative to foreclose contract-rescission suits that Congress intended to authorize. Because the Court's

2       FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
                    MASTER FUND, LTD.
                 JACKSON, J., dissenting

proper role is to give effect to the will of the people, not supplant it, I respectfully dissent.

## I

## A

In 1940, Congress made a post-Great Depression push to "eliminate certain abuses in the securities industry." *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963). As part of this effort, it simultaneously enacted the Investment Company Act (ICA) and the Investment Advisers Act (IAA).

As relevant to the ICA, Congress found that "the national public interest and the interest of investors are adversely affected" when, among other things, "investment companies issue securities containing inequitable or discriminatory provisions." 15 U. S. C. §80a–1(b)(3). Accordingly, Congress included a rule of construction that the ICA "shall be interpreted" to "mitigate and, so far as is feasible, to eliminate the conditions enumerated in [the statute] which adversely affect the national public interest and the interest of investors." §80a–1(b). One of those conditions was that "every share of stock hereafter issued by a registered management company . . . shall be a voting stock and have equal voting rights with every other outstanding voting stock." §80a–18(i).[1]

Consistent with Congress's anti-abuse purpose, the ICA and the IAA contained a stick: "Every contract made in violation of any provision of [the ICA or the IAA], and every contract heretofore or hereafter made, the performance of which involves the violation of . . . any provision of" the statutes "*shall be void*." §47(b), 54 Stat. 846 (ICA) (emphasis added); §215(b), *id.*, at 856 (IAA).

These provisions mirrored Section 29(b) of the Securities Exchange Act, which Congress had enacted just six years

--------

[1] Respondents' claim for rescission is premised on the allegation that petitioners violated this condition.

JACKSON, J., dissenting

before. See 48 Stat. 903. Section 29(b), in turn, "drew from" States' "enactment of their own 'blue-sky' statutes," which were widely understood by both judges and scholars to create a private right to rescission. *Aaron* v. *SEC*, 446 U. S. 680, 711 (1980) (Blackmun, J., concurring in part and dissenting in part); see Brief for Securities-Law Scholars et al. as *Amici Curiae* 6–8 (collecting scholarship and state-court cases). Thus, in a 1970 case called *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, the Court thought it "eminently sensible" that the "lower federal courts ha[d] read §29(b), which has counterparts in . . . the [ICA] and the [IAA]," as giving "the victim" the "right to rescind" the contract. *Id.*, at 387–388.

We confirmed that view nine years later in another case called *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11 (1979) (*TAMA*). *TAMA* held that Section 215 of the IAA "fairly implies a right to specific and limited relief in a federal court"—namely, a private legal action to seek rescission of an unlawful contract. *Id.*, at 18. Declining to place "emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute," *TAMA* focused exclusively on "whether Congress intended to create the private remedy asserted." *Id.*, at 15–16 (citing, *inter alia, Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568 (1979)).

With respect to the "shall be void" language in Section 215, the *TAMA* Court concluded that the text of the statute was clear. See 444 U. S., at 18–19. First, we explained, the "language of" Section 215, along with that of a related provision that "broadly proscribe[d] fraudulent practices by investment advisers," ran "to [the] benefit [of] the clients of investment advisers, and . . . the parties to advisory contracts." *Id.*, at 16–17. Second, "[b]y declaring certain contracts void, §215 by its terms necessarily contemplate[d] that the issue of voidness under its criteria may be litigated somewhere." *Id.*, at 18. To be sure, Section 215 voidness

might be "raised defensively." *Ibid.* "But the legal conse-
quences of voidness are typically not so limited." *Ibid.* As
the Court had recognized in *Mills*, and as federal and state
courts have acknowledged for years, "[a] person with the
power to void a contract ordinarily may resort to a court to
have the contract rescinded." *TAMA*, 444 U. S., at 18; see
*id.*, at 19 (citing *Mills*, 396 U. S., at 388). So, we reasoned,
"when Congress declared in §215 that certain contracts are
void, it intended that the customary legal incidents of void-
ness would follow, including the availability of a suit for re-
scission." 444 U. S., at 19.

Notably, all nine Justices agreed with the part of *TAMA*
that held a private right of action for rescission was implicit
in Section 215.[2] Four Justices disagreed with a later part
of the opinion, which held that a different section of the IAA
did not imply a "private right of action for a *monetary
award*." *Id.*, at 20 (emphasis added); see *id.*, at 29–33
(White, J., dissenting). In reaching that conclusion, the
majority observed that Congress had chosen to "*expressly*
authoriz[e] private suits for damages in prescribed
circumstances" in "each of the securities laws that preceded
the [IAA]," including the ICA. *Id.*, at 20 (emphasis added).
"'Obviously, then, when Congress wished to provide a
private damages remedy, it knew how to do so and did so
expressly.'" *Id.*, at 21 (quoting *Touche Ross*, 442 U. S., at
572). The fact that it did not make any such express
statement in the IAA, we held, showed "that Congress did
not intend to authorize a cause of action for anything
beyond limited equitable relief." *TAMA*, 444 U. S., at 22.

Our decision in *TAMA* necessarily controlled the question
whether Section 47(b) of the ICA implied a private right of

---

[2] Even Justice Powell, whose well-known criticisms of the Court's
implied-rights jurisprudence would help shape the Court's more recent
decisions in this area of law, viewed the rescission-focused part of *TAMA*
"as compatible with [his] dissent in *Cannon* v. *University of Chicago*, 441
U. S. 677, 730 (1979)." *TAMA*, 444 U. S., at 25 (concurring opinion).

JACKSON, J., dissenting

action for rescission, since Section 47(b) was identical to—and enacted simultaneously with—Section 215 of the IAA. See *Smith* v. *City of Jackson*, 544 U. S. 228, 233 (2005) (opinion of Stevens, J.) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes").

So, as of 1979, it was indisputable that Section 47(b) of the ICA contained a private right of action for rescission—on that, even the majority agrees. See *ante*, at 9.[3]

## B

Today's dispute has arisen because, one year after *TAMA*, Congress amended Section 47(b) and revised its "shall be void" language. The new Section 47(b) reads:

"(1) A contract that is made, or whose performance involves, a violation of [the ICA], or of any rule, regulation, or order thereunder, is unenforceable by either party . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of [the ICA].

"(2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its

———————

[3] The majority does equivocate, though, offering as a throwaway that "*TAMA* does not get Saba far" because it "blesses only a 'limited private remedy . . . to void an *investment advisers* contract.'" *Ante*, at 10 (quoting *TAMA*, 444 U. S., at 24). This distinction appears nowhere in the parties' briefs and does not amount to anything. *TAMA* referred to "investment advisers contract[s]" because the case was about the IAA—short for the "*Investment Advisers* Act"—not because there is something special about the contracts of investment advisers as compared to other investment-related contracts.

6        FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
                     MASTER FUND, LTD.
                   JACKSON, J., dissenting

grant and would not be inconsistent with the purposes of [the ICA]." 15 U. S. C. §80a–46(b).

Unlike in the original version of the statute, the amended Section 47(b)'s two paragraphs pertain to two different scenarios. In the first, the contract at issue has not yet been performed, but the ICA violation renders it "unenforceable by either party." §80a–46(b)(1). In the second (the one relevant here), the problematic contract "has been performed," but "a court may not deny rescission at the instance of any party" unless the equities counsel otherwise. §80a–46(b)(2).

In their respective Reports, the relevant House and Senate Committees expressed "that private rights of action under [the amendments] should be implied to and in its enforcement to the same extent that such causes of action [were] implied under the [original statute]." S. Rep. No. 96–958, p. 14 (1980); see also H. R. Rep. No. 96–1341, p. 29 (1980). Both Committees explained that, "[w]ith a relatively small staff charged with administrative responsibility for policing potentially unlawful securities-related activities, the [Securities and Exchange] Commission [could not] be expected to bring actions against even a large portion of those engaged in schemes, devices and activities that are prohibited by federal law." S. Rep. No. 96–958, at 14; see also H. R. Rep. No. 96–1341, at 28. Private actions would fill that gap.

II

In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context can serve a useful purpose in clarifying the statutory text. See *Alexander* v. *Sandoval*, 532 U. S. 275, 288 (2001). "Statutory history," in particular, "is an important part of [the] context" that supports a statute's text—"the water in which [the words] swim." *United States* v. *Hansen*, 599 U. S. 762, 775 (2023). And we generally "presum[e]"

Cite as: 608 U. S. ____ (2026)          7

JACKSON, J., dissenting

Congress is aware of our prior "judicial interpretation of a statute" when it takes up the pen to reenact or amend it. *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978).

Therefore, while the majority proceeds as if Section 47(b) arrived in the U. S. Code vacuum-sealed and devoid of any background, the correct interpretation of Section 47(b) must account for *TAMA*.[4] Viewed in context, the critical question is whether Congress intended to reject *TAMA*'s holding when it undertook to amend the statute after that case was decided.

To be sure, the fact that Congress changed the statute provides an opening for the argument that Section 47(b) is different now. *Ante*, at 9–10. But to its credit, for all its emphasis on the "substantive" nature of Congress's "renovation[s]," the majority never goes so far as to say that Congress rejected *TAMA*. *Ante*, at 9–10. Nothing in the text or structure of the amended Section 47(b) shows that Congress did so.

A

Start with the text. Section 47(b) was not crafted on a blank slate—Congress built on its prior work and this Court's relevant interpretations. Read in context, the text of Section 47(b) confirms that Congress expected the courts to keep with *TAMA*.

The majority is quick to emphasize that Congress removed key language from Section 47(b)—*i.e.*, the words "shall be void"—and infers from this that the amendment was meant to excise the private right of action *TAMA* had recognized. See *ante*, at 9–10. But our analysis in *TAMA*

_____

[4] The majority views this observation as an "accusation" and calls it "perplexing" because the Court's opinion does address *TAMA*. *Ante*, at 10, n. 4. But the majority's consideration of statutory history is clearly an afterthought; *TAMA* plays no role in its affirmative interpretation of Section 47(b) and is discussed only in the course of responding to Saba's counterarguments, *after* the majority's own statutory analysis has concluded. See *ante*, at 9–10.

8        FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
                    MASTER FUND, LTD.
                    JACKSON, J., dissenting

did not rely exclusively on those specific words. Moreover, the majority's focus on what Congress *took out* of the statute diverts attention from what matters just as much (if not more) for the interpretive exercise here: the language Congress *added*. The words Congress inserted into Section 47(b)—"a court may not deny rescission at the instance of any party"—more than make up for the ones that it removed.

Most notably, Congress inserted "rescission." Of all the words that it could have chosen, Congress went with the very one that had appeared the year before in the *TAMA* opinion. See *TAMA*, 444 U. S., at 19. Congress was armed with *TAMA* at the time it amended the statute, and it quite obviously chose to say the (previously) quiet part out loud. It struck "shall be void" and inserted what that meant (as we had explained in *TAMA*): "rescission."

Next, Congress authorized rescission "at the instance of any party." The mention of the "party" raising rescission represents another substantial upgrade from the old Section 47(b), and one that also sets the statute apart from others that we've said fall short of "'rights-creating' language." *Sandoval*, 532 U. S., at 288; see, *e.g.*, *Thompson* v. *Thompson*, 484 U. S. 174, 177, 183 (1988) (no implied private right of action in 28 U. S. C. §1738A, a statute designed to "'avoid jurisdictional competition and conflict between State courts'" and "addressed entirely to States and state courts"). And for all the majority's protestations that Section 47(b) is a "mandate directed to . . . courts, rather than a provision that confers a right on a specified class of persons," *ante,* at 5 (some alterations and internal quotation marks omitted), it fails to account for the fact that we found an implied private right of action in *TAMA* based on language that contained *no* reference to the party raising rescission.

What is more, the majority's insistence that the provision is a rule of decision for courts, not rights-creating language

Cite as: 608 U. S. ____ (2026)    9

JACKSON, J., dissenting

for parties, *ante*, at 5–6, simply does not track with the ordinary meaning of the phrase "at the instance of." See 7 Oxford English Dictionary 1040 (2d ed. 1989) (defining "at the instance of" as "at the solicitation, suit, instigation, or suggestion of"); Webster's New International Dictionary 1287 (2d ed. 1954) (defining "instance" as "[t]he institution and prosecution of a suit"). Also, rescission is an affirmative right. "[A] party believing himself entitled to have the contract abrogated and to have himself restored to his former position *may invoke the aid of a court of equity* and obtain a decree for the rescission of the contract and, in proper cases, for the cancellation of the instrument evidencing it." H. Black, Rescission of Contracts and Cancellation of Written Instruments §1, p. 4 (1916) (Black) (emphasis added); cf. *TAMA*, 444 U. S., at 19, n. 8 (declining to adopt the "anomalous construction" that "Congress intended that claims under §215 would be raised only in state court," thereby "remit[ting] the litigation of a federal right to the state courts," since rescission had customarily been recognized as a cause of action).[5]

Then there's the capaciousness of the phrase "any party." "Party" could refer to a party to a contract. See Brief for Respondents 2. Or it could refer to a party to a litigation. See Brief for Petitioners 2. Either way, "any" ensures that, under the statute, rescission can be raised affirmatively or defensively, whether by the shareholder, the investment company, the plaintiff, or the defendant. The majority's conclusion that the phrase "any party" contemplates only those rescission claims raised defensively is not only

—————

[5] The majority points out that "[e]lsewhere, [Black's] treatise explains that a party may obtain equitable rescission only if 'he is able to show the existence of some well-recognized title to equitable relief, such as fraud, mistake, or duress.'" *Ante*, at 6, n. 2 (quoting Black §14). Fair enough. But a suit for rescission based on "fraud, mistake, or duress" is still an affirmative suit for rescission. And the question here is whether Congress intended for a party to be able to file a suit for rescission.

10    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL MASTER FUND, LTD.

JACKSON, J., dissenting

divorced from the text but also illogical given the circumstances. Once a contract "has been performed"—which is the universe in which Section 47(b)(2) operates—what is left to sue about, such that a party with a rescission claim would be in a position to raise it as a defense? By that point, an aggrieved party is most likely to seek rescission affirmatively in order to undo what has already been done.

Section 47(b)'s internal structure provides further support for this reasoning. Whereas Section 47(b)(2) contemplates a legal action to rescind the violative contract *after* it "has been performed," Section 47(b)(1)'s language applies *pre*-performance, warning parties that a contract in violation of the ICA "is unenforceable." Section 47(b)'s paragraphs therefore represent two sides of the same "shall be void" coin, spelled out in more detail than in the original Section 47(b): Neither party may enforce a contract that violates the ICA, but "any party" may seek to rescind such a contract if it has already been performed.

## B

That leaves the broader statutory structure, which the majority says supports its view that Congress did not mean to imply a private right of action. *Ante*, at 6–7. The structure of the ICA cannot bear that weight. True, the Securities and Exchange Commission "bears primary responsibility for ensuring compliance with the ICA." *Ante*, at 7. But unlike the statute at issue in *Sandoval*, which itself "empower[ed] agencies to enforce [the relevant] regulations," Section 47(b) does not contain any remedial scheme specific to its own "substantive rule." 532 U. S., at 289–290. Instead, Section 47(b) uses the phrase "any party"—an odd phrase to denote only the Commission. See *Oxford Univ. Bank* v. *Lansuppe Feeder, LLC*, 933 F. 3d 99, 105–106 (CA2 2019).

The majority also points to the ICA's two express private rights of action, which, it says, show that Congress "'knew

JACKSON, J., dissenting

how to'" provide a private remedy expressly and chose not to do so in Section 47(b). See *ante*, at 7 (quoting *Touche Ross*, 442 U. S., at 572). But the express-authorization language upon which the majority hangs this hat concerns private actions principally or exclusively *for damages*, not rescission. See 15 U. S. C. §§80a–35(b), 80a–29(h). And we know from *TAMA* that those two types of relief are not the same. So, one could just as easily infer that, when Congress wanted money damages to flow to private parties in this context, it thought it was necessary to say so. Indeed, in *TAMA*, we cited the two express provisions as a point against finding an implied private right of action for *damages*, but did not invoke them at all in our discussion of whether the IAA created an implied private right of action for *rescission*. See 444 U. S., at 20, and n. 10.

The majority provides no persuasive basis for rejecting that reasoning here. One year after *TAMA*, Congress surely proceeded to amend the ICA feeling safe in the knowledge that a private right of action for rescission had already been established. Congress likely understood—because we had said—that it had to operate expressly only if it wished to extend that right of action to encompass damages as well.

### III

Thus far I have rested my analysis solely on the text, structure, and statutory history of Section 47(b). The fact that the majority nevertheless focuses almost all of its fire on my additional consideration of legislative history should alert readers to the potency of that material in this case. Viewed in conjunction with text, structure, and statutory history, legislative history can be a relevant and reliable indicium of Congress's intent.

A

Rather than guess about what Congress intended Section 47(b) to mean based on what "changed language typically indicates," *ante*, at 10, consider the legislative records in which the Committees spearheading the 1980 amendments explicitly said what they intended. As noted earlier, the relevant House and Senate Committees expressed their "wishes to make clear that private rights of action under [the amendments] should be implied to and in its enforcement to the same extent that such causes of action [were] implied under the [ICA]." S. Rep. No. 96–958, at 14; see also H. R. Rep. No. 96–1341, at 29. I have seldom seen a clearer expression of legislative intent in a congressional record.

The Committees also anticipated and responded directly to the majority's headlining structural argument. The majority reasons that Congress could not have meant to include an implied private right of action for rescission because "the Securities and Exchange Commission bears primary responsibility for ensuring compliance with the ICA." *Ante*, at 6–7. But the Committee Reports explained that, "[w]ith a relatively small staff charged with administrative responsibility for policing potentially unlawful securities-related activities, the Commission [could not] be expected to bring actions against even a large portion of those engaged in schemes, devices and activities that are prohibited by federal law." S. Rep. No. 96–958, at 14; H. R. Rep. No. 96–1341, at 28. So, "private lawsuits serve as an added deterrent to conduct made unlawful by Congress, without the necessity of governmental involvement." *Ibid.*; see also S. Rep. No. 96–958, at 14 (describing private suits as "a necessary adjunct to the Commission's enforcement efforts").

The House Committee, for its part, seemed to view the private right of action we acknowledged in *TAMA* as the bare minimum, not a dispensable option. Its Report noted that, although private suits "significantly assist the

JACKSON, J., dissenting

congressional goal of promoting fair corporate suffrage," "in recent years, the Supreme Court [had] turned its focus toward a strict construction of statutory language and expressed intent." H. R. Rep. No. 96–1341, at 28. It then cited *TAMA* as an example of that development—*i.e.*, as illustrative of the Court's refusal to "imply a private cause of action for damages" even on behalf of plaintiffs who "offered to show both that the law was violated and that they suffered monetary loss as a result." H. R. Rep. No. 96–1341, at 28–29, n. 6. The next sentence provided the Committee's reaction: "The Committee wishes to make plain that *it expects the courts to imply private rights of action under this legislation.*" *Id.*, at 29 (emphasis added). Far from rejecting or overturning *TAMA*'s recognition of a private right of action for rescission, the House Committee expressly recognized the rescission right and set its sights on the next goal: ensuring that the courts recognized an implied private right of action for damages.

We have inferred legislative adoption of our holdings from far less. In *Evans* v. *United States*, 504 U. S. 255 (1992), for example, we said that the "silence of the body that is empowered to give us a 'contrary direction' if it does not want the [prevailing judicial interpretation] to survive is consistent with an application of the normal presumption" that Congress has accepted that interpretation. *Id.*, at 269. In the case before us now, there is something much better than "silence": In addition to the text and structure of the amended statute itself, we have legislative history containing an explicit statement from Congress imploring "courts to imply private rights of action under" the amended Section 47(b), and a specific reference to *TAMA* as an example of a judicial decision that found one fewer implied right than Congress wanted. H. R. Rep. No. 96–1341, at 28–29, and n. 6; see also S. Rep. No. 96–958, at 14.

Still, the majority insists that legislative history is irrelevant to properly ascertaining Congress's intent. Its efforts

14    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.
JACKSON, J., dissenting

to neutralize the pellucid statements in this legislative record include characterizing them as relating to "implying causes of action in the 'federal securities laws' generally." *Ante*, at 12.  But the Reports say what they say.  The Committees explained that, when it amended the statute we are interpreting today, Congress wanted to preserve "to the same extent" the implied private right of action that the Court had recognized in the ICA.  S. Rep. No. 96–958, at 14.[6]

Unable to explain this compelling evidence of Congress's intent, the majority pivots to arguing that I "ignor[e]" "[t]he most relevant portions" of the legislative history.  *Ante*, at 12.  (I welcome the majority's close reading of the Reports.) According to the majority, the only parts of the Reports that matter are the ones specifically dedicated to Section 47(b). *Id.,* at 12.  Those sections say that the new Section 47(b) "is designed to provide clearer statutory guidance in interpreting [the] equitable rescission remedy."  H. R. Rep. No. 96–1341, at 27; see S. Rep. No. 96–958, at 10.  In the majority's view, this section—which "nowhere mentions a private right of action"—instead "confirm[s] the obvious point that rescission is a *remedy*."  *Ante*, at 12 (emphasis added).  But the majority does not, and cannot, explain why the fact that the Report references a "remedy" matters in the context of today's dispute.  See n. 6, *supra.*  What is relevant for interpreting Section 47(b) is whether a plaintiff *may bring suit* to seek rescission (however rescission is characterized)—

—————————

[6] It is true that "the House Report expresses the Committee's expectation that '[i]n appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under *Section 36(a)* of the Investment Company Act,'" rather than Section 47(b). *Ante*, at 13 (emphasis added) (quoting H. R. Rep. No. 96–1341, at 29).  The majority extrapolates from this that the House Report is irrelevant to Section 47(b).  But the majority misses the point.  The House Committee was providing, yes, an "example"—it referenced Section 36(a) as merely illustrative of the kinds of circumstances in which courts should allow private actions under the ICA.  H. R. Rep. No. 96–1341, at 29.

Cite as: 608 U. S. ____ (2026)          15

JACKSON, J., dissenting

and the answer to that question is clearly yes. See Black §1, p. 4 ("[A] party . . . may invoke the aid of a court of equity and obtain a decree for the rescission of the contract").

The majority's favorite parts of the Reports thus only serve to confirm that Congress was, in fact, thinking about rescission when it amended Section 47(b). And what did Congress know about rescission as relevant to Section 47(b) in 1980? That this Court had found in its language an implied private right of action to seek rescission. See *TAMA*, 444 U. S., at 18–19; H. R. Rep. No. 96–1341, at 28–29, n. 6 (citing *TAMA*).

So, "[o]ne wonders," *ante*, at 13, indeed: If Congress had *not* wished for a private right of rescission to be made available and thus wanted to *undo* our holding in *TAMA*, why did it not say so in the text of the statute or mention that anywhere in the legislative history?

B

For those who remain unconvinced, I posit that their doubts likely stem from a categorical unwillingness to accept the help of legislative history when interpreting statutes. That is certainly the case for the majority. See *ante*, at 11, 14. But if, as the majority says, it is "mission impossible" to "divin[e] how Congress would have wanted courts to resolve the question presented in this case" with the help of legislative history, *ante*, at 11, a juridical cast of thousands—including many of our illustrious predecessors—has accepted the challenge. Legislative history is a traditional tool courts consult when attempting to ascertain Congress's intent regarding ambiguous statutory text (such as, as relevant here, disputes concerning implied private rights of action). This is a worthy and necessary effort because it

16    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.
JACKSON, J., dissenting

prevents the preferences of judges from supplanting the will of the people.[7]

1

Using legislative history as a tool of statutory interpretation is a time-honored tradition.  Indeed, the Judiciary's collective "old-time devotion" to the legislative-history hymnal, *ante*, at 14, held steady for more than a century—until the late 1980s, when the Court suddenly began to sing a different tune.  See S. Breyer, On the Uses of Legislative History in Interpreting Statutes, 65 S. Cal. L. Rev. 845, 846 (1992) (explaining that the Supreme Court used to rely on legislative history so routinely that a discussion of it appeared "in almost every statutory case [the Court] decided in 1981" and the shift away from legislative history did not begin in earnest until 1989); see also P. Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 197 (1983) (explaining that, in the flurry of legislative activity during the New Deal era and "through the next fifty years, resort to legislative history became pervasive").

It is, in fact, the majority's castigation of legislative history as something verging on extralegal (see, *e.g.*, *ante*, at 14) that is the historical outlier.  And that consternation is especially odd coming from a Court that eagerly delves into the transcripts of the ratification debates, the Framers' private correspondence, and the Federalist Papers to ascertain what the Framers would have "understood," "recognized," and "expected."  *Learning Resources, Inc.* v. *Trump*, 607 U. S. ___, ___ (2026) (slip op., at 6); *Moore* v. *Harper*, 600

---

[7]A side note: The majority appears to have little problem appreciating the relevance of statutory history, see *ante*, at 10, n. 4, yet balks at the mention of its companion, legislative history.  My point here is that *both* kinds of history are valuable to the interpretive task, and neither should be prohibited.  The majority arbitrarily accepts one while condemning the other.

JACKSON, J., dissenting

U. S. 1, 21–22, 26–27 (2023); *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 789–822, 832–838, and nn. 23, 24 (1995).

Courts' traditional use of materials Congress generated while drafting and enacting statutes accords with the "natural" instincts of a judge attempting to "understand the context and purpose" of that law when the text is subject to more than one interpretation. Breyer, 65 S. Cal. L. Rev., at 848. But consulting the legislative record is not just informative. Doing this also serves a vital separation-of-powers function rooted in the structure of our democratic system. As the majority emphasizes from the get-go, "Congress, not the Judiciary, decides" the law. *Ante*, at 1; see also *Brown* v. *United States*, 8 Cranch 110, 128–129 (1814) ("[A]ll . . . questions of policy [are] proper for the consideration of a department which can modify it at will; not for the consideration of a department which can pursue only the law as it is written"). Using legislative history helps prevent judges who are dutybound to interpret Congress's laws from making them instead.

This means that those who find it inappropriate for courts to use legislative history must grapple with the potential consequences of the resulting void. What interest does it really serve to blind ourselves to the congressional record when we interpret Congress's handiwork? Who benefits from that? "Why, of all the many tools judges use to help interpret unclear statutory language (context, tradition, custom, precedent, dictionary meanings, administrability, and so on), should they not use *this* one?" Breyer, 65 S. Cal. L. Rev., at 861 (emphasis added).

There is no flattering or straightforward answer to such questions. That is probably why, for the better part of the 20th century—including after the Court "swor[e] off the habit of venturing beyond Congress's intent" in 1975, see *Sandoval*, 532 U. S., at 287 (citing *Cort* v. *Ash*, 422 U. S. 66, 78 (1975))—courts consulted the legislative history when

18    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.
JACKSON, J., dissenting

called upon to determine Congress's intent to authorize a private right of action. See *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 91 (1981) (listing, as the relevant considerations in determining "whether Congress intended to create" an implied private right of action, "the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies"). By my count, the Court relied on legislative history to help determine Congress's intent in more than a dozen implied-private-right-of-action cases after 1975.[8] And why shouldn't we have done so? In this area, all agree that "[s]tatutory intent . . . is determinative." *Sandoval*, 532 U. S., at 286.

To be sure, "legislative history is not the law." *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 523 (2018). And no one is arguing that legislative history should trump unambiguous statutory text. But when a statute's text needs

_____

[8] *Morse* v. *Republican Party of Va.*, 517 U. S. 186, 232–234 (1996) (opinion of Stevens, J., joined by Ginsburg, J.); *id.*, at 240 (Breyer, J., joined by O'Connor and Souter, JJ., concurring in judgment); *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 189 (1994); *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U. S. 1083, 1103–1104 (1991); *Thompson* v. *Thompson*, 484 U. S. 174, 179, 183–187 (1988); *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 425, and n. 7 (1987); *Daily Income Fund, Inc.* v. *Fox*, 464 U. S. 523, 536–539 (1984); *Guardians Assn.* v. *Civil Serv. Comm'n of New York City*, 463 U. S. 582, 599–602 (1983) (opinion of White, J., joined by Rehnquist, J.); *id.*, at 609 (Powell, J., joined by Burger, C. J., concurring in judgment); *Jackson Transit Authority* v. *Transit Union*, 457 U. S. 15, 24–28 (1982); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 382–388 (1982); *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 17–18, and n. 27 (1981); *California* v. *Sierra Club*, 451 U. S. 287, 294–296 (1981); *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 94–95 (1981); *Universities Research Assn., Inc.* v. *Coutu*, 450 U. S. 754, 773–781 (1981); *TAMA*, 444 U. S. 11, 17–18 (1979); *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 571, n. 11 (1979); *Cannon* v. *University of Chicago*, 441 U. S. 677, 686, n. 7, 694–701 (1979); *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 293–294 (1979).

JACKSON, J., dissenting

clarification, discarding legislative history turns the Court's assessment of Congress's intent into a transparently empty gesture. Even worse, it inappropriately elevates the Justices' own power by promoting our views about the "best" policy call. But Congress is not our rival; courts are not in the policymaking arena at all. So we should leave judgment calls about best policies to the Legislature, which routinely creates an illuminating record as part of its legislative process. "Respecting Congress's work product not only makes it more likely that courts will interpret the law in a manner consistent with legislative purposes, but also . . . that Congress will perceive the courts as productive partners rather than as meddlers substituting their own preferences for that of the legislative branch." R. Katzmann, Judging Statutes 10 (2014) (Katzmann).

2

Consistent with the "classic criticism" of courts' use of legislative history, the majority's aversion to the employment of this interpretive tool appears to stem from an intuition that "Congress's subjective intent [is] [un]knowable." *Ante*, at 12. But it is hard to take that criticism seriously when the modern Court nonetheless routinely interprets statutes by speculating about what Congress must have wanted. See, *e.g.*, *Learning Resources*, 607 U. S., at \_\_\_ (plurality opinion) (slip op., at 8) (drawing from a "practical understanding of legislative intent" that "Congress would not have delegated highly consequential power through ambiguous language" (internal quotation marks omitted)).[9]

—————

[9] See also, *e.g.*, *Biden* v. *Nebraska*, 600 U. S. 477, 506 (2023) (applying the major questions doctrine to conclude that "'Congress would likely have intended for itself'" the task of making "'[t]he basic and consequential tradeoffs' inherent in a mass debt cancellation program" (quoting *West Virginia* v. *EPA*, 597 U. S. 697, 730 (2022))); *id.*, at 521 (BARRETT, J., concurring) (relying on the absence of "context clues" to determine whether "Congress would have delegated the power to the agency"); *FDA*

20      FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.
JACKSON, J., dissenting

Indeed, in this very case the majority purports to know what "Congress intended" when it inserted an "express provision of one method of enforcement" in the ICA. *Ante*, at 7 (internal quotation marks and alterations omitted). It appears, then, that our disagreement today is really about the *tools* courts use to ascertain congressional intent, not its importance or knowability. See *ante*, at 11, n. 5 (characterizing congressional intent drawn from text as "objectified intent" (internal quotation marks omitted)).

On that point, the committee reports that accompany federal statutes are a first-rate indicator of Congress's intent. Committee reports are not a randomly generated collection of Member reflections; these official documents provide crucial information about proposed legislation and thus play a significant role in the legislative process itself. "Committee reports are generally circulated at least two calendar days before legislation is considered on the floor" in order to explain "a bill's context, purposes, policy implications, and details" to Members of Congress and their staffs. Katzmann 20, 130–131, n. 62 (citing A. LaRue, Senate Manual Containing the Standing Rules, Orders, Laws, and Resolutions Affecting the Business of the United States Senate, S. Doc. No. 107–1, p. 17 (2001)). The reports therefore serve as the final sales pitch for a bill, and "there is evidence that lawmakers themselves pay more attention to these reports than a statute's text to understand the statute's purpose and meaning." *Learning Resources, Inc.*, 607 U. S., at ___ (JACKSON, J., concurring in part and concurring in judgment) (slip op., at 2) (citing A. Gluck & L. Bressman, Statutory Interpretation From the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 965–966, 968–969 (2013)); see

---

v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 160 (2000) ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion").

Cite as: 608 U. S. \_\_\_\_ (2026)    21

JACKSON, J., dissenting

also Katzmann 37–38. Consequently, quite far from being irrelevant, committee reports often contain the most accurate encapsulation of the legislation's intended meaning.

Given this, it is wrong to suggest that a court's reference to and reliance on statements in committee reports is like picking out friends at a crowded party. *Ante*, at 12. The better analogy is to consulting the user's manual the manufacturer writes to guide piecing together its product. Cf. Gluck & Bressman, 65 Stan. L. Rev., at 978 (explaining that the reports have "internal institutional and implementation-related functions").

Justices have traditionally understood this relatively simple proposition. "'In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Digital Realty Trust, Inc.* v. *Somers*, 583 U. S. 149, 170 (2018) (SOTOMAYOR, J., concurring) (quoting *Garcia* v. *United States*, 469 U. S. 70, 76 (1984); alteration and some internal quotation marks omitted). Even Justice Robert Jackson—yes, the very one whose teaching serves as the coda to the majority's denunciation of legislative history, see *ante*, at 14—recognized that reliance on legislative history is "justified where the face of the Act is inescapably ambiguous, and then . . . we should not go beyond Committee reports, which presumably are well considered and carefully prepared." *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 341 U. S. 384, 395 (1951) (concurring opinion).[10]

———————

[10] There's more. See *Simpson* v. *United States*, 435 U. S. 6, 17 (1978) (Rehnquist, J., dissenting) ("The report of a joint conference committee of both Houses of Congress, for example, or the report of a Senate or House committee, is accorded a good deal more weight than the remarks even of the sponsor of a particular portion of a bill on the floor of the

22    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.
JACKSON, J., dissenting

The majority's failure—or refusal—to accept this might stem from what commentators have called a prevailing "academic contempt for Congress." V. Nourse, A Decision Theory of Statutory Interpretation: Legislative History by the Rules, 122 Yale L. J. 70, 142 (2012). Academics may think what they wish of Congress; this Court's jurisprudence ought not be grounded in such contempt. For an institution that purports to "follow the law as written by Congress," *Leal Garcia* v. *Texas*, 564 U. S. 940, 942 (2011) (*per curiam*), it is strange, to say the least, that we give "scant consideration" to "how Congress actually functions." Katzmann 8. The Court should at least endeavor to understand and accurately assess the legislative process from which Section 47(b) arises—so as to better "separate the useful from the misleading," Gluck & Bressman, 65 Stan. L. Rev., at 989—before discarding "the views of the 42-member House Committee on Interstate and Foreign Commerce," *ante*, at 14.

\*    \*    \*

In his now-famous dissent in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), Justice Powell admonished the Court for abandoning "the intent of Congress" and "substitut[ing] its own views as to the desirability of private enforcement." *Id.*, at 740. So it is here. The Court today turns a deaf ear to the unified call of text, statutory structure, and

---

chamber"); *Bank One Chicago, N. A.* v. *Midwest Bank & Trust Co.*, 516 U. S. 264, 276 (1996) (Stevens, J., concurring) ("Legislators, like other busy people, often depend on the judgment of trusted colleagues when discharging their official responsibilities. . . . Representatives and Senators may appropriately rely on the views of the committee members in casting their votes"); *Commissioner* v. *Acker*, 361 U. S. 87, 94 (1959) (Frankfurter, J., dissenting) ("Congress can be the glossator of the words it legislatively uses either by writing its desired meaning, however odd, into the text of its enactment, or by a contemporaneously authoritative explanation accompanying a statute. The most authoritative form of such explanation is a congressional report defining the scope and meaning of proposed legislation").

Cite as: 608 U. S. ____ (2026)          23

JACKSON, J., dissenting

history, and substitutes its own views as to the undesirability of private enforcement. Justice Powell's warning remains unheeded, to the detriment of Congress and the private parties it sought to empower.

(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CISCO SYSTEMS, INC., ET AL. *v.* DOE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 24–856.   Argued April 28, 2026—Decided  June 23, 2026

Plaintiffs contend that the Chinese Government persecuted them because of their religious beliefs, and that Cisco Systems, Inc. enabled that persecution by developing surveillance technology that allowed China to identify and apprehend them.  Plaintiffs allege that Cisco and its executives are liable for aiding and abetting violations of international law, citing the Alien Tort Statute (ATS).  One plaintiff also seeks to hold two Cisco executives liable for aiding and abetting violations of the Torture Victim Protection Act of 1991 (TVPA).

The ATS grants federal district courts jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U. S. C. §1350.  The ATS lay mostly dormant for two centuries after its enactment.  In the last few decades, however, litigants have urged courts to allow private rights of action under the ATS for various alleged human rights abuses.  In *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, this Court held that "the ATS is a jurisdictional statute creating no new causes of action."  *Id*., at 724.  At the same time—and in considerable tension with that point—the Court said that the ATS allows for the possibility of new, judicially created causes of action to enforce norms of international law.  *Id.,* at 724–725.  Though *Sosa* did not "close the door" on judicially created rights of action under the ATS, *Sosa* emphasized the narrowness of its view and underscored the need for "vigilant doorkeeping."  *Id*., at 729.  *Sosa* proposed a two-step framework for creating those causes of action: First, a plaintiff must show that the norm has a "definite content and acceptance among civilized nations," *id*., at 732; second, a plaintiff must show that it would be prudent for the court to create the proposed cause of action when the political branches have not acted, *id*., at 726, 736, n. 27.  Since *Sosa,* the Court has never

2                CISCO SYSTEMS, INC. *v.* DOE

Syllabus

created an ATS right of action.

In this case, the District Court dismissed plaintiffs' complaint, but the Ninth Circuit reversed in relevant part. The Ninth Circuit focused on whether aiding-and-abetting liability may be imposed under the ATS. 73 F. 4th 700, 716. At *Sosa*'s first step, the Ninth Circuit found that "aiding and abetting liability is sufficiently definite and universal to be a viable form of liability under the ATS." 73 F.4th, at 718. At the second step, it concluded that neither "foreign relations concerns" nor "deference to Congress" supplied a "prudential reason to decline to recognize aiding or abetting liability." *Id.*, at 720. The Ninth Circuit also held that the TVPA "encompasses claims against those who aid and abet torture." *Id.*, at 744. The Court granted certiorari to determine whether Cisco may be held liable for aiding and abetting offenses under the ATS, and whether two of its executives may be held liable under the TVPA for aiding and abetting torture.

*Held*:

1. Courts may not create new causes of action for violations of international norms under the ATS. Pp. 7–12.

Two points drive the Court's decision. First, judicial authority under *Sosa*'s second step was "narrow at the outset." *Nestlé USA, Inc.* v. *Doe*, 593 U. S. 628, 636 (opinion of THOMAS, J.). *Sosa* instructed federal courts to exercise "great caution in adapting the law of nations to private rights," 542 U. S., at 728, and to assess the "practical consequences" of creating new liability under the ATS, including the "risks of adverse foreign policy consequences." *Id.*, at 728, 732–733. Because ATS cases by their nature implicate foreign policy, it is difficult to think of a case in which a court "might safely conclude" that a new ATS cause of action would not have detrimental foreign policy consequences. *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 284 (2018) (GORSUCH, J., concurring). Second, the power to create causes of action belongs to Congress. See, *e.g.*, *Sosa*, 542 U. S., at 727; *Nestlé*, 593 U. S., at 634–635 (opinion of THOMAS, J.). The Court has "rejected the practice of fashioning rights of action as [it] see[s] fit," *FS Credit Opportunities Corp.* v. *Saba Capital Master Fund, Ltd.*, 608 U. S. ___, ___–___ (slip op., at 3–4). Congress is better positioned than courts to evaluate the policy tradeoffs of creating liability. This is especially true in an area like this one, where the Constitution expressly delegates authority to Congress to "define and punish . . . Offences against the Law of Nations." Art. I, §8, cl. 10. For that reason, creating any cause of action "is an extraordinary act that places great stress on the separation of powers." *Nestlé*, 593 U. S., at 636 (opinion of THOMAS, J.).

Because of these concerns, *Sosa* consciously designed a test that would be extremely difficult to meet. But what *Sosa* made difficult, subsequent legal developments have made impossible. Since *Sosa* was

Syllabus

decided, the Court has firmly committed to the view that judicially cre-
ated causes of action offend the separation of powers in almost every
circumstance. Recent cases emphasize that "'[i]f there are sound rea-
sons to think Congress might doubt the efficacy or necessity of a dam-
ages remedy, the courts must refrain from creating it.'" *Egbert* v.
*Boule*, 596 U. S. 482, 491 (quoting *Ziglar* v. *Abbasi*, 582 U. S. 120, 137;
alterations omitted). In the ATS context, there will always be at least
a "single sound reason" to conclude that Congress might not want the
judiciary to take the lead. *Sosa* itself identified one applicable in every
case: "the possible collateral consequences of making international
rules privately actionable." 542 U. S., at 727. And Congress has cre-
ated an "alternative remedial structure"—the TVPA—which precludes
the creation of a cause of action. *Ziglar*, 582 U. S., at 137.

The Court therefore will not continue to "indulge the fiction" that
creating new ATS causes of action is sometimes appropriate. *Edwards*
v. *Vannoy*, 593 U. S. 255, 274. Correcting *Sosa*'s unfulfilled prediction
will not upset reliance interests and will promote stability. *Sosa* was
overly optimistic in its prediction that there might be a narrow class of
cases in which courts may create ATS actions without infringing on
the prerogatives of the political branches. In truth, this class is a null
set. And because courts cannot create new rights of action to remedy
violations of international law, there is necessarily no liability for aid-
ing and abetting such violations.

2. The TVPA, which contains an express cause of action against
someone who "subjects" another to torture, does not provide for aiding-
and-abetting liability. Pp. 12–14.

In *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver,
N. A.*, 511 U. S. 164, the Court held that §10(b) of the Securities Ex-
change Act of 1934 does not create civil aiding-and-abetting liability
because the statute does not mention "aiding and abetting," differenti-
ating §10(b) from other civil statutes in which Congress expressly pro-
vided for that specialized form of liability. *Id.*, at 175−177, 182−183.
The TVPA similarly nowhere mentions aiding-and-abetting liability,
and that silence is enough to settle the issue.

Plaintiffs argue that "subjects" in the TVPA is broad enough to in-
clude aiding-and-abetting liability, but it is not. To "subject" another
to torture means "to cause to undergo or submit to," Webster's Third
New International Dictionary 2275, signaling a causal connection be-
tween torturer and victim. Aiding-and-abetting liability, by contrast,
encompasses many forms of assistance provided by those who are one
(or more) steps removed from the torturer. See *Twitter, Inc.* v.
*Taamneh*, 598 U. S. 471, 497. *Central Bank* rejected a similar argu-
ment that the phrase "'directly or indirectly'" authorized aiding-and-
abetting liability, explaining that "aiding and abetting liability

4                    CISCO SYSTEMS, INC. *v.* DOE

Syllabus

extends beyond persons who engage, even indirectly, in a proscribed activity." 511 U. S., at 175−176.  The same analysis applies here: Aiding-and-abetting liability sweeps more broadly than the language Congress chose.

73 F. 4th 700, reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. JACKSON, J., filed an opinion concurring in part and dissenting in part, in which KAGAN, J., joined.  SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined as to Parts I–III and V.

Cite as: 609 U. S. \_\_\_\_ (2026)  1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–856

CISCO SYSTEMS, INC., ET AL., PETITIONERS *v.*
DOE I, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 23, 2026]

JUSTICE BARRETT delivered the opinion of the Court.

The Alien Tort Statute grants federal courts jurisdiction to hear cases involving violations of the law of nations. While conceding that the ATS is "strictly jurisdictional," we have also said that courts have narrow authority to create causes of action under it. *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 713, 724–725 (2004). These positions are in obvious tension with one another. More significantly, however, asserting such authority would intrude on both Congress's prerogative to provide rights of action and the power of the political branches to direct the Nation's foreign policy. It is therefore unsurprising that this Court has never created an ATS action. The authority to do so, always described as slight, is more accurately described as nonexistent.

Today, we close the door that *Sosa* cracked and hold that courts may not create new causes of action for violations of international norms. We also hold that the Torture Victim Protection Act of 1991, which contains an express cause of action, does not provide for aiding-and-abetting liability.

Opinion of the Court

# I

## A

In the early days of our Nation, two incidents involving foreign diplomats "caused substantial foreign-relations problems." *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 253 (2018). The French Minister Plenipotentiary complained to the Continental Congress and threatened to leave the country after the Secretary of the French Legation was assaulted in Philadelphia. See *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 120 (2013). And a New York constable caused an "international incident" a few years later when he entered the house of the Dutch Ambassador to arrest one of his servants. *Jesner*, 584 U. S., at 253.

At the time, the Articles of Confederation did not provide a federal forum to redress injuries like these. True, the wronged foreign officials could resort to state court. But Secretary of Foreign Affairs John Jay cautioned that "the Federal Government does not appear . . . to be vested with any judicial powers competent to the cognizance and judgment of such cases." 3 Dept. of State, The Diplomatic Correspondence of the United States of America 446 (1837). Other leading figures were similarly troubled that the Articles failed to "provi[de] for the case of offenses against the law of nations" and "consequently le[ft] it in the power of any indiscreet member to embroil the Confederacy with foreign nations." The Federalist No. 42, p. 265 (C. Rossiter ed. 1961) (J. Madison).

The new Constitution equipped the Federal Government to deal with this problem. Article III extends the judicial power to "all Cases affecting Ambassadors, other public ministers and Consuls," and "to Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." §2. The First Congress implemented these provisions through the Judiciary Act of 1789, which established lower federal courts and granted them jurisdiction to hear suits implicating foreign affairs. See, *e.g.*, §9, 1

Opinion of the Court

Stat. 77 (admiralty and maritime jurisdiction); *ibid.* (jurisdiction over "suits against consuls or vice-consuls"); §11, *id.*, at 78 (jurisdiction over suits where "an alien is a party"). The Act also included what is now known as the Alien Tort Statute. §9, *id.*, at 77. The ATS grants federal district courts jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350.

The ATS lay mostly dormant after its enactment. Litigants only occasionally invoked its jurisdictional grant. See *Bolchos* v. *Darrel*, 3 F. Cas. 810 (No. 1,607) (SC 1795) (seizure of slaves from a captured ship); *Moxon* v. *The Fanny*, 17 F. Cas. 942 (No. 9,895) (Pa. 1793) (seizure of a brig and cargo by French privateers). And in time, another statute authorized federal courts to hear claims arising under treaties. See Act of Mar. 3, 1875, §1, 18 Stat. 470, as amended, 28 U. S. C. §1331. So for almost 200 years, the ATS did virtually no work.

That changed in 1980. In *Filartiga* v. *Pena-Irala*, 630 F. 2d 876, the Second Circuit permitted an ATS suit by foreign plaintiffs against a foreign offender for engaging in torture in violation of international law. The court identified no express cause of action; instead, it held that the ATS "open[s] the federal courts for adjudication of the rights already recognized by international law." *Id.*, at 887. Taking note, other plaintiffs urged courts to allow private rights of action under the ATS for various alleged human rights abuses. See, *e.g.*, *Tel-Oren* v. *Libyan Arab Republic*, 726 F. 2d 774 (CADC 1984) (*per curiam*); *Kadic* v. *Karadžić*, 70 F. 3d 232 (CA2 1995); *Beanal* v. *Freeport-McMoran, Inc.*, 197 F. 3d 161 (CA5 1999); *In re Estate of Marcos, Human Rights Litigation*, 25 F. 3d 1467 (CA9 1994); *Abebe-Jira* v. *Negewo*, 72 F. 3d 844 (CA11 1996).

While the Courts of Appeals wrestled with novel ATS suits, Congress enacted a related cause of action. The Torture Victim Protection Act of 1991 allows certain victims

who are tortured or killed to recover damages against the perpetrators. 106 Stat. 73, note following 28 U. S. C. §1350. But because many human rights abuses fall outside the TVPA, plaintiffs continued pressing courts to fashion rights of action under the ATS.

Over a decade later, this Court interpreted the ATS for the first time. In *Sosa* v. *Alvarez-Machain*, we held that the ATS does not permit a court to create a cause of action for arbitrary detention in violation of international law. 542 U. S., at 699, 736–738. In so holding, we stressed that "the ATS is a jurisdictional statute creating no new causes of action." *Id.*, at 724. At the same time—and in considerable tension with the first point—we said that the ATS allows for the possibility of new, judicially created causes of action to enforce norms of international law. *Id.*, at 724–725.

To justify this conclusion, *Sosa* reasoned that the First Congress would not have expected the ATS to "l[ie] fallow" until Congress or state legislatures enacted causes of action for violations of the law of nations. *Id.*, at 719. Law-of-nations offenses formed part of "the ambient law of the era," and some "were understood to be within the common law." *Id.*, at 714, 720. William Blackstone's legal treatise discussed three: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.*, at 715 (citing 4 Commentaries on the Laws of England 68 (1769)). Given this history, *Sosa* "assume[d] that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." 542 U. S., at 724. But *Sosa* "found no basis to suspect Congress had any examples in mind beyond those torts corresponding to Blackstone's three primary offenses." *Ibid.* And it acknowledged that when the ATS was enacted, no one would have understood the statute as a grant of authority to create causes of action. *Id.*, at 725–726. Nonetheless, *Sosa* asserted that courts have very modest

Opinion of the Court

authority to create causes of action under the ATS for violations of international norms. *Id.*, at 724–725.

Recognizing the tension between this interpretation of the ATS and the limits of the judicial role, *Sosa* emphasized the narrowness of its view. Though it did not "close the door" to "independent judicial recognition of actionable international norms," it underscored the need for "vigilant doorkeeping." *Id.*, at 729. To that end, *Sosa* proposed a two-step framework. First, a plaintiff must show that the norm has a "definite content and acceptance among civilized nations." *Id.*, at 732. (This was an effort to head off judicial creativity with respect to the norms themselves.) Second, a plaintiff must show that it would be prudent for the court to create the proposed cause of action when the political branches have not acted. *Id.*, at 726, 736, n. 27; *Jesner*, 584 U. S., at 257–258 (plurality opinion). (This was a warning that courts must tread lightly, because creating rights of action is Congress's prerogative, and foreign policy is the political branches' domain.) In *Sosa*, the plaintiff's claim failed at the first step, so the Court had no occasion to proceed to the second. 542 U. S., at 736–738.

Since *Sosa*, we have repeatedly turned away plaintiffs asserting claims under the ATS. In *Kiobel* v. *Royal Dutch Petroleum Co.*, we held that any ATS claims are subject to the presumption against extraterritoriality; thus, those "seeking relief for violations of the law of nations occurring outside the United States" are "barred." 569 U. S., at 124. We reiterated that point in *Nestlé USA, Inc.* v. *Doe*, holding that "allegations of general corporate activity . . . cannot alone establish domestic application of the ATS." 593 U. S. 628, 634 (2021). And in *Jesner* v. *Arab Bank, PLC*, we refused to impose ATS liability on foreign corporations. 584 U. S., at 272.

6                    CISCO SYSTEMS, INC. *v.* DOE

B

Plaintiffs in today's case are practitioners of Falun Gong, a religious movement that originated in China in the 1990s. They contend that the Chinese Government persecuted them because of their religious beliefs, and that Cisco Systems, Inc. enabled that persecution by developing surveillance technology that allowed China to identify and apprehend them. By engaging in this conduct, plaintiffs say, Cisco and its executives aided and abetted violations of international law—namely, torture; cruel, inhuman, or degrading treatment; forced labor; prolonged and arbitrary detention; crimes against humanity; extrajudicial killing; and forced disappearance. One plaintiff also seeks to hold two Cisco executives liable under the TVPA for aiding and abetting torture.

After the District Court dismissed plaintiffs' complaint, 66 F. Supp. 3d 1239, 1247 (ND Cal. 2014), the Ninth Circuit reversed in relevant part, 73 F. 4th 700, 746 (2023). It did not decide whether the underlying violations of international law satisfied *Sosa*'s test. 73 F. 4th, at 716. Instead, it analyzed only whether aiding-and-abetting liability may be imposed under the ATS. *Ibid.* At *Sosa*'s first step, the Ninth Circuit found that "aiding and abetting liability is sufficiently definite and universal to be a viable form of liability under the ATS." 73 F. 4th, at 718. And at the second step, it concluded that neither "foreign relations concerns" nor "deference to Congress" supplied a "prudential reason to decline to recognize aiding or abetting liability." *Id.*, at 720. The Ninth Circuit also held that the TVPA "encompasses claims against those who aid and abet torture or extrajudicial killing." *Id.*, at 744.

Judge Christen dissented in part. She saw "several sound reasons to decline to recognize a cause of action for aiding and abetting" the alleged acts. *Id.*, at 748. Notably, she reasoned that "a finding of liability in this case would necessarily require a showing that the Chinese Communist

Opinion of the Court

Party and Ministry of Public Security violated international law." *Ibid.* And such a finding "could have serious ramifications" for U. S.-China relations, "fraught as they already are." *Id.*, at 749. Permitting aiding-and-abetting liability under the ATS is thus "inconsistent with [the court's] obligation to exercise 'great caution in adapting the law of nations to private rights.'" *Id.*, at 751 (quoting *Sosa*, 542 U. S., at 728).

Six judges dissented from the denial of rehearing en banc. They reasoned that ATS liability should be restricted "to causes of action comparable to historically recognized torts." 113 F. 4th 1230, 1237 (CA9 2024) (opinion of Bumatay, J.). That is so because creating any additional liability under the ATS violates the separation of powers. *Id.*, at 1245–1247. And the dissenting judges would exercise greater caution before "intrud[ing] in the delicate relations with another world superpower." *Id.*, at 1237, 1247–1248.

We granted certiorari to determine whether Cisco may be held liable for aiding and abetting offenses under the ATS, as well as whether two of its executives may be held liable under the TVPA for aiding and abetting torture. 607 U. S. 1120 (2026).

## II

Our starting point is *Sosa*'s key insight: The ATS "is a jurisdictional statute creating no new causes of action." 542 U. S., at 724. Put differently, "[a]s enacted in 1789, the ATS gave the district courts 'cognizance' of certain causes of action," which "bespoke a grant of jurisdiction, not power to mold substantive law." *Id.*, at 713.

Justice Scalia would have stopped there. *Id.*, at 743–744 (opinion concurring in part and concurring in judgment). He cited "[t]he general rule" that "'grants of jurisdiction alone . . . are not themselves grants of lawmaking authority'" and noted that *Sosa* had not identified any reason why the ATS is an exception. *Ibid.* He then observed that *Sosa*'s

Opinion of the Court

"reasons why courts must be circumspect" in developing law under the ATS are actually "reasons why courts cannot possibly be thought to have been given" this power in the first place. *Id*., at 747.

These criticisms resonated, and since then, various Members of the Court have thoughtfully explained the problems with *Sosa*'s openness—no matter how limited—to judicially created causes of action under the ATS. See *Jesner*, 584 U. S., at 274 (THOMAS, J., concurring); *id*., at 280–293 (GORSUCH, J., concurring in part and concurring in judgment); *Nestlé*, 593 U. S., at 634–640 (opinion of THOMAS, J., joined by GORSUCH and KAVANAUGH, JJ.); see also *id*., at 658 (ALITO, J., dissenting) (noting the "strong arguments that federal courts should never recognize new claims under the ATS"). These opinions highlight the great difficulty of satisfying *Sosa*'s second step under our modern separation-of-powers precedent.

Two points drive our decision today. First, judicial authority under *Sosa*'s second step was "narrow at the outset." *Nestlé*, 593 U. S., at 636 (opinion of THOMAS, J.). Indeed, *Sosa* instructed federal courts to exercise "great caution in adapting the law of nations to private rights." 542 U. S., at 728. Before doing so, courts must assess the "practical consequences" of creating new liability under the ATS, including the "risks of adverse foreign policy consequences." *Id*., at 728, 732–733.

But ATS cases by their nature implicate foreign policy. As we have explained, "the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in th[is] context." *Kiobel*, 569 U. S., at 116. After all, the "point of [a new ATS cause of action is] to vindicate 'a norm of international character.'" *Jesner*, 584 U. S., at 284 (GORSUCH, J., concurring) (quoting *Sosa*, 542 U. S., at 725). It is thus difficult to think of a case in which a court "might safely conclude" that a new ATS cause of action would not have detrimental foreign policy consequences. *Jesner*, 584

Opinion of the Court

U. S., at 284 (GORSUCH, J., concurring).  Even suits against American defendants (like this one against Cisco) generally require a court to examine allegations of heinous acts committed by foreign nations or individuals.[1]

The second point is that the power to create causes of action belongs to Congress.  See, *e.g.*, *Sosa*, 542 U. S., at 727; *Nestlé*, 593 U. S., at 634–635 (opinion of THOMAS, J.).  For this reason, *Sosa* cautioned that the "decision to create a private right of action is one better left to legislative judgment in the great majority of cases."  542 U. S., at 727.

This understates the point.  While our cases at one time permitted courts to provide redress if Congress remained silent, see, *e.g.*, *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 433 (1964), "we have since rejected the practice of fashioning rights of action as we see fit," *FS Credit Opportunities Corp.* v. *Saba Capital Master Fund, Ltd.*, 608 U. S. ___, ___–___ (2026) (slip op., at 3–4).  That is so because "[h]ome-grown causes of action are difficult to reconcile with 'the Constitution's separation of legislative and judicial power.'"  *Id.*, at ___ (slip op., at 4) (quoting *Egbert* v. *Boule*, 596 U. S. 482, 491 (2022)); see also *Ziglar* v. *Abbasi*, 582 U. S. 120, 133 (2017).  Congress is better positioned than courts to evaluate the policy tradeoffs of creating liability.  See *Nestlé*, 593 U. S., at 638–639 (opinion of THOMAS, J.).  This is especially true in an area like this one, where the Constitution expressly delegates authority to Congress.  Art. I, §8, cl. 10 (Congress may "define and punish . . . Offences against the Law of Nations").  For that reason, creating any cause of action "is an extraordinary act that places great stress on

_____

[1] The dissent is confident about the ability of federal courts to "improve foreign relations" and make judgments that are "'consonant with U. S. foreign policy interests.'"  *Post*, at 16 (opinion of SOTOMAYOR, J.).  The Constitution's allocation of power, however, requires greater judicial humility.

Opinion of the Court

the separation of powers." *Nestlé*, 593 U. S., at 636 (opinion of THOMAS, J.).

*Sosa* acknowledged both these points: that crafting new causes of action under the ATS "raise[s] risks of adverse foreign policy consequences," 542 U. S., at 728, and intrudes on Congress's prerogative to create private rights of action, *id.*, at 727. Because of these concerns, it consciously designed a test that would be extremely difficult to meet. But what *Sosa* made difficult, subsequent legal developments have made impossible.

Since *Sosa* was decided, we have firmly committed to the view that judicially created causes of action offend the separation of powers in almost every circumstance. As a result, we have virtually eliminated the practice of fashioning them. Our cases have emphasized that "'[i]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, the courts must refrain from creating it.'" *Egbert*, 596 U. S., at 491 (quoting *Ziglar*, 582 U. S., at 137; alterations omitted); *Jesner*, 584 U. S., at 264 (quoting this language). Indeed, "'[e]ven a *single* sound reason to defer to Congress is enough.'" *Egbert*, 596 U. S., at 491 (quoting *Nestlé*, 593 U. S., at 635 (opinion of THOMAS, J.); emphasis added). In the ATS context, there will always be at least a "single sound reason" to conclude that Congress might not want the judiciary to take the lead. *Sosa* itself identified one applicable in every case: "the possible collateral consequences of making international rules privately actionable." 542 U. S., at 727. For *Sosa*, this was reason "for judicial caution." *Ibid.* Under our current precedent, it is reason not to proceed at all. Cf. *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 458 (2015) ("'growth of judicial doctrine'" is a relevant consideration when reconsidering a prior case).

Though one is enough, there is another "sound reason" staying the judiciary's hand. Our post-*Sosa* cases have stressed that if Congress has created "an alternative

Cite as: 609 U. S. ____ (2026)          11

Opinion of the Court

remedial structure," then "*that alone*" precludes the crea-tion of a cause of action. *Ziglar*, 582 U. S., at 137 (emphasis added); see also *Egbert*, 596 U. S., at 493. Such a structure exists here: the TVPA, which creates an express cause of action under the ATS. *Sosa* acknowledged that Congress had limited the TVPA "to specific subject matter" and had taken no subsequent action to expand the covered conduct. 542 U. S., at 728. Again, for *Sosa*, this was reason to slow down, *ibid.*; under our current precedent, it is reason to stop.

Beyond changes in the law, it is hard to see how correct-ing *Sosa*'s unfulfilled prediction would upset reliance inter-ests. Any such interests would belong to future plaintiffs—who surely are not relying on the remote possibility that U. S. courts would create an ATS action if they were some-day injured and sought one. As for stability, today's deci-sion promotes rather than undermines it. We have never—not once—created an ATS cause of action. Cf. *Edwards* v. *Vannoy*, 593 U. S. 255, 274 (2021) ("No one can reasonably rely on a supposed exception that has never operated in practice"). And given the "high bar" that *Sosa* set, 542 U. S., at 727, it is a stretch to believe that we ever would have. We thus see no need to "indulge the fiction" that cre-ating new ATS causes of action is sometimes appropriate. *Edwards*, 593 U. S., at 274. Doing so would "mislea[d] liti-gants" by suggesting that recovery might be available while "needlessly expend[ing] . . . scarce [judicial] resources." *Id.*, at 275.[2]

—————

[2] While few plaintiffs have successfully litigated ATS suits to final judgment, many more have sued and obtained large settlements. See C. Ewell, O. Hathaway, & E. Nohle, Has the Alien Tort Statute Made a Difference?: A Historical, Empirical, and Normative Assessment, 107 Cornell L. Rev. 1205, 1251–1252, 1278 (2022) (discussing ATS settle-ments, some of which resulted in "multimillion-dollar payments to plain-tiffs"). Shutting off the possibility of additional ATS liability thus also provides clarity to defendants.

12                CISCO SYSTEMS, INC. *v.* DOE

Opinion of the Court

In sum, we close the door that *Sosa* cracked to judicially created ATS liability.  We do not disturb *Sosa*'s holding that the ATS is a jurisdictional statute; nor do we revisit its assumption that causes of action are available for torts corresponding to the Blackstone three.[3]  We conclude only that *Sosa* was overly optimistic in its prediction that there might be a narrow class of cases in which courts may create ATS actions without infringing on the prerogatives of the political branches.  In truth, this class is a null set.

What result for this case?  Cisco argues that the Ninth Circuit erred in holding that aiding-and-abetting liability exists under the ATS for the torts alleged by the plaintiffs.  Cisco is correct.  Courts cannot create new rights of action to remedy violations of international law, so there is necessarily no liability for aiding and abetting such violations.  Plaintiffs' ATS claims against Cisco must be dismissed.

III

One of the plaintiffs also sued two Cisco executives under the TVPA for aiding and abetting torture.  Recall that the TVPA provides a cause of action against someone who

——————

[3]The dissent recruits the Blackstone three as support for judicial power to create ATS actions.  If the Blackstone three, the dissent asks, then why not more?  *Post*, at 12.  The Blackstone three do not give the dissent what it is looking for, because *Sosa* did not invoke them as evidence that the ATS originally granted courts the authority to *create* causes of action.  Under the prevailing jurisprudence of the time, *Sosa* said, such torts were understood to be "found or discovered" by courts rather than "made or created."  542 U. S., at 725.  Offering examples, *Sosa* stated that offenses against ambassadors "appea[r] to have been" at top of mind, violations of safe conduct "were probably understood to be actionable," and "individual actions arising out of prize captures and piracy may well have also been contemplated."  *Id.*, at 720.  Those are the only ATS actions this Court has ever specifically mentioned, and to the extent there has been reliance on the availability of those three actions, we see no need to revisit them.  But while we say "this far and no further," the dissent would go very far indeed.  In the name of honoring the expectations of the First Congress, it would leverage the Blackstone three to justify power that would have confounded the First Congress.

Cite as: 609 U. S. ____ (2026)            13

Opinion of the Court

"subjects" another to torture.  106 Stat. 73, note following 28 U. S. C. §1350.

In *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), we held that §10(b) of the Securities Exchange Act of 1934 does not create civil aiding-and-abetting liability.  Our analysis was straightforward: Section 10(b) "'does not in terms mention aiding and abetting.'"  *Id.*, at 175.  That fact differentiates it from other civil statutes in which Congress expressly provided for that specialized form of liability.  *Id.*, at 176−177, 182−183 (collecting statutes).  Because Congress "'ha[s] little trouble'" imposing  aiding-and-abetting  liability  "'expressly,'"  its omission of the phrase in §10(b) was dispositive.  *Id.*, at 177 (quoting *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 734 (1975)).

Just so here.  The TVPA nowhere mentions aiding-and-abetting liability, and that silence is enough to settle the issue.  As then-Judge Kavanaugh put it, *Central Bank* makes it "crystal clear" that no aiding-and-abetting liability exists under the TVPA because Congress has not expressly provided for it.  *Doe* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 87 (CADC 2011) (dissenting opinion).  We agree.

Plaintiffs counter that "subjects" is broad enough to include aiding-and-abetting liability.  It is not.  To "subject" another to torture means "to cause to undergo or submit to." Webster's Third New International Dictionary 2275 (1993); see also American Heritage Dictionary 1788 (3d ed. 1992) ("[t]o cause to experience").  The term thus signals a causal connection between torturer and victim.  Aiding-and-abetting liability, by contrast, encompasses many forms of assistance provided by those who are one (or more) steps removed from the torturer.  See *Twitter, Inc.* v. *Taamneh*, 598 U. S. 471, 497 (2023) (disclaiming a "strict nexus" requirement).  *Central Bank* rejected a similar argument—that the phrase "'directly or indirectly'" in §10(b) authorized aiding-and-abetting liability.  511 U. S., at 175−176.  The "basic

14          CISCO SYSTEMS, INC. *v.* DOE

Opinion of the Court

flaw" in that interpretation "is that aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity." *Id.*, at 176. After all, it encompasses those "who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Ibid.* The "basic flaw" we identified in *Central Bank* exists here too: Aiding-and-abetting liability sweeps more broadly than the language Congress chose.[4]

\*    \*    \*

We recognize, as does the dissent, *post*, at 23–24, that ATS and TVPA cases frequently involve heinous and inhumane acts. The political branches or other international actors may well provide redress. But we decline to distort the statutory text or the Constitution's allocation of powers to enlist U. S. courts in that project. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

—————

[4] We have noted that the TVPA "contemplates liability" against those "who do not personally execute the torture"—in particular, those who "giv[e] an order to torture." *Mohamad* v. *Palestinian Authority*, 566 U. S. 449, 458 (2012); see also *post*, at 25 (opinion of SOTOMAYOR, J.) (relying on this assertion). Such liability, however, is much more limited than aiding-and-abetting liability.

Cite as: 609 U. S. \_\_\_\_ (2026)    1

Opinion of JACKSON, J.

# SUPREME COURT OF THE UNITED STATES

No. 24–856

CISCO SYSTEMS, INC., ET AL., PETITIONERS *v.* DOE I, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2026]

JUSTICE JACKSON, with whom JUSTICE KAGAN joins, concurring in judgment in part and dissenting in part.

I agree with JUSTICE SOTOMAYOR's discussion of the Alien Tort Statute. See *post,* at 5–10 (dissenting opinion). But I think the Court is correct to conclude that the Torture Victim Protection Act of 1991 (TVPA) does not encompass aiding-and-abetting liability. I write separately because, while my textual analysis of the TVPA tracks the majority's, see *ante,* at 12–14, I do not agree with how the majority deploys *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), here.

*Central Bank* is relevant insofar as it instructs that "there is no general presumption" that a statute imposes aiding-and-abetting liability; rather, Congress must provide it. *Id.,* at 182. And here, Congress's use of the term "subjects" does not do so. But, as JUSTICE SOTOMAYOR discusses, *post*, at 26–27, the majority is wrong to treat *Central Bank* as creating a "magic words" test for aiding-and-abetting liability generally. Contra, *ante,* at 10–11; see *Soto* v. *United States*, 605 U. S. 360, 373 (2025) ("[W]e have so often denounced" a "'magic words' test"). Instead, the absence of the words "aid" and "abet" in the statute we interpreted in *Central Bank* was but one consideration of many. See 511 U. S., at 176–180. I therefore concur only in the judgment as to the majority's TVPA holding.

Cite as: 609 U. S. \_\_\_\_ (2026)    1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 24–856

CISCO SYSTEMS, INC., ET AL., PETITIONERS *v.*
DOE I, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 23, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join as to Parts I, II, III, and V, dissenting.

Petitioner Cisco Systems, Inc., allegedly knowingly designed and intentionally built a mass-surveillance system for the Chinese Communist Party to use to identify, track, arrest, and torture thousands of religious minorities. As all agree, if respondents' allegations were to be proved true, then that would mean Cisco violated universally recognized norms of international law. Respondents thus sued Cisco in a federal action under the Alien Tort Statute (ATS), which vests jurisdiction in district courts over "any civil action by an alien for a tort only, committed in violation of the law of nations," 28 U. S. C. §1350. In *Sosa* v. *Alvarez-Machain*, 542 U. S. 692 (2004), this Court held that the ATS permits federal courts to find implied causes of action authorizing plaintiffs to sue defendants who violated international law.

The Court nonetheless closes the courthouse doors not just to respondents, but to virtually every future litigant seeking redress for a violation of international law under the ATS. It thus overrules *Sosa*, without even acknowledging that it is doing so. Today's decision marks yet another low point in this Court's esteem for its precedents.

2                    CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

Further, the Court also errs by ignoring the plain meaning of the Torture Victim Protection Act of 1991 (TVPA) and slamming the door completely shut to claims by U. S. citizens against those who aid and abet torture.

I respectfully dissent from both of the Court's holdings.

I

A

The following factual allegations are drawn from respondents' amended complaint and are assumed to be true because this appeal arises from the grant of a motion to dismiss. *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 734 (2011).

Respondents are members of Falun Gong, a Chinese spiritual movement. Falun Gong members believe in the three core tenets of "Truthfulness, Compassion, and Tolerance." App. 2. Many of its members have vocally opposed the Chinese Communist Party (CCP).

In 1999, the CCP designated Falun Gong organizations as illegal and called for violent political crackdowns against them. During these "violent struggle" campaigns (or "*douzheng*"), CCP and Chinese Government officials subjected Falun Gong targets to brutal human-rights abuses, including torture, arbitrary detention, and reeducation through labor. *Id.*, at 12; see 73 F. 4th 700, 712 (CA9 2023) (detailing "beatings with steel rods[,] . . . shocking with electronic batons, sleep deprivation, . . . violent force-feeding," and more). The United States State Department estimates that hundreds of thousands of Falun Gong believers have been persecuted, and media sources report that thousands have been tortured to death.

To target Falun Gong members, the CCP determined that it needed to develop a sophisticated, nationwide internet-surveillance tool to track Falun Gong activity online. It thus devised the anti-Falun Gong "'Golden Shield'": a "'vast and multi-tiered'" bespoke "'surveillance system'" that the CCP contemplated would obtain and organize all

Cite as: 609 U. S. \_\_\_\_ (2026)          3

SOTOMAYOR, J., dissenting

manner of data on the Falun Gong members across China, including address information, internet history, and financial and family information. *Id*., at 710. At the time the CCP came up with the idea, however, Chinese engineers lacked the technical expertise to create such technology. As a result, the CCP turned to American technology companies and invited them to submit proposals to design its Golden Shield system.

Petitioner Cisco answered the CCP's call with an aggressive campaign to secure the Golden Shield contract. Cisco's CEO (and other senior executives) personally met with China's President and other officials to discuss and "explicit[ly] support" "the Golden Shield's *douzheng* objectives and goals." App. 62. Internal files reveal Cisco's "pledge to satisfy the repressive anti-Falun Gong purposes of the" program, while characterizing Falun Gong and its members as "'viruses,'" "'despicable,'" and an "'evil cul[t]'"—all mirroring CCP propaganda denigrating Falun Gong members as "subhuman." *Id*., at 20–21. Cisco's public Chinese marketing materials also described the company's "promis[e] to tailor the apparatus" to meet the CCP's objectives, including "the *douzheng* of" Falun Gong. *Id*., at 22–23; see 73 F. 4th, at 710 (describing Cisco brochures offered at Chinese trade shows marketing its services "as useful to the '*douzheng*' of Falun Gong").

Cisco's push succeeded. In 2001, the CCP selected Cisco to submit designs for the Golden Shield and later awarded it contracts to develop the program. Cisco, using engineers working from the United States, then created a massive surveillance system that "'analyzed patterns of Falun Gong Internet activity to enable the intelligent identification of individual Falun Gong Internet users,'" while providing "'real time monitoring'" of "'Falun Gong Internet traffic patterns'" and sharing the results with the CCP to "facilitate the . . . forced conversion through torture'" of Falun Gong members. *Id*., at 711. Over time, Cisco engineers in

4    CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

San Jose, California continued to provide support while also upgrading and expanding the system. For example, Cisco later created a video-surveillance system that, combined with facial-recognition technology, has become a "'primary means' of identifying Falun Gong practitioners through non-internet activities, such as protests or religious practice." *Ibid.*

Armed with the vast suite of technological tools Cisco provided, the CCP identified, arrested, and tortured thousands of Falun Gong members. *Id.*, at 712.

B

Respondents in this case are among those victims or are family members of those who have disappeared and are suspected or confirmed dead. They allege that the CCP used information collected and stored by the Golden Shield program in forced-conversion sessions to which they were subjected. For example, on top of prolonged isolation and physical torture, Chinese officials leveraged information about some of respondents' family members (and employed threats against those family members) to coerce respondents into renouncing their religious beliefs.

In 2011, respondents filed this action against Cisco and two of its executives, suing under the ATS and alleging that Cisco aided and abetted seven international-law violations: torture; cruel, inhuman, or degrading treatment; forced labor; prolonged and arbitrary detention; crimes against humanity; extrajudicial killing; and forced disappearance. One of the respondents, who is a U. S. citizen, also brought a claim alleging that two individual defendants aided and abetted his torture in violation of the TVPA.

After the District Court dismissed the action, the Ninth Circuit reversed, holding that aiding-and-abetting liability was available under both the ATS and the TVPA. *Id.*, at

SOTOMAYOR, J., dissenting

709. This Court then agreed to review the Ninth Circuit's judgment. 607 U. S. 1120 (2026).[1]

## II

A straightforward application of this Court's settled case law should have allowed respondents' ATS claims against Cisco to proceed.

## A

The ATS, enacted in 1789, permits foreign nationals harmed by violations of international law to obtain compensation for their injuries in U. S. court. See 28 U. S. C. §1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States"). The statute is limited: As this Court explained in *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, the ATS "is in terms only jurisdictional," meaning that it gives courts authority to entertain suits but does not itself create any causes of action that permit plaintiffs to sue someone. *Id.*, at 712. Even so, consulting the historical context surrounding the ATS's passage, the Court determined that Congress "intended" for the ATS "to have practical effect the moment it became law." *Id.*, at 724. Consistent with that understanding, *Sosa* held that, although federal courts should be "restrained" in doing so, they may find implied private causes of action under the ATS "for violations of any international law norm" comparable to "the historical paradigms familiar when [the ATS] was enacted." *Id.*, at 725, 732. Those paradigms include three international-law offenses that were well established when the ATS was enacted: "violation of safe conducts, infringement of the rights of ambassadors, and

---

[1] Petitioners did not allege a split among the Circuits over whether aiding-and-abetting liability is available under either statute. See Pet. for Cert. 14–24, 29–33.

6          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

piracy." *Id*., at 715. As all agree, the ATS allows implied private rights of action for at least these three offenses.

To invoke an additional implied cause of action under the ATS, *Sosa* explained, the plaintiff must identify a norm of international law that has sufficiently "definite content" that has gained "acceptance among civilized nations." *Id*., at 732. As part of that inquiry, courts must also make a "judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id*., at 732–733. Applying this test, the Court rejected the arbitrary-detention claim that had been raised there. The plaintiff had not alleged a sufficiently definite norm of international law. Recognizing the plaintiff's proposed cause of action would also have "breathtaking" consequences by permitting "a cause of action in federal court for any arrest, anywhere in the world," so long as it is "unauthorized by the law of the jurisdiction in which it took place." *Id*., at 736. The Court thus declined to allow a new cause of action under the ATS. *Ibid.*

"In the years since, this Court has read *Sosa* to announce a two-step test for recognizing the availability of a cause of action under the ATS." *Nestlé USA, Inc.* v. *Doe*, 593 U. S. 628, 648 (2021) (SOTOMAYOR, J., concurring in part and concurring in judgment). At step one, courts ask "'whether a plaintiff can demonstrate that the alleged violation is "of a norm that is specific, universal, and obligatory."'" *Ibid.* If the plaintiff makes that required showing, then the court must determine "'whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion.'" *Ibid.* That discretionary inquiry must account for "the potential implications for the foreign relations of the United States of recognizing such causes [of action]," as courts must be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa*, 542 U. S., at 727.

SOTOMAYOR, J., dissenting

B

This case succeeds at each of *Sosa*'s steps.  At step one, there is no dispute.  Respondents allege that Cisco aided and abetted the violation of seven international-law norms: torture; cruel, inhuman, or degrading treatment; forced labor; prolonged and arbitrary detention; crimes against humanity; extrajudicial killing; and forced disappearance. See 73 F. 4th, at 713.  Before this Court, Cisco does not make any arguments at all at step one.  See Brief for Petitioners 17.  It does not dispute that all seven norms are specific, universal, and obligatory, as required by *Sosa*.  Nor does it dispute that international law recognizes aiding-and-abetting liability, either in general or as a substantive part of each of these seven norms.

Cisco, joined by the United States as *amicus curiae*, instead exclusively focuses on *Sosa*'s second step, at which courts ask "'if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy.'" *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 264 (2018). Both fail to demonstrate that it would be improper to allow this case to proceed.

First, Cisco and the United States argue that an aiding-and-abetting theory of liability can never satisfy *Sosa*'s second step because such liability will always endanger foreign-policy concerns.  Those concerns, however, are best addressed on a case-by-case basis, rather than a categorical one.  See *Sosa*, 542 U. S., at 733, n. 21 (discussing possibility of "case-specific deference to the political branches").

This case disproves the idea that recognizing aiding-and-abetting liability will necessarily impair U. S. foreign-policy interests.  The political branches have already consistently condemned China's treatment of Falun Gong members. The Solicitor General confirmed in this very case that "the United States [has] long condemned China's treatment of Falun Gong practitioners," and has sanctioned Chinese officials for "gross violations of human rights," including

8          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

"particularly severe violations of religious freedom."  Brief for United States as *Amicus Curiae* on Pet. for Cert. 9.  Similarly, in 2020, the Trump administration released a report on the Government's strategic approach to China that highlighted how the Government had released "statements calling on the [Chinese] government to respect the rights of" religious minorities including "Falun Gong adherents, all of whom face repression and persecution in China"; the report also announced that the "United States will continue to take a principled stand against the use of our technology to support China's military and its technology-enabled authoritarianism."[2]  In addition, the State Department has "denounce[d]" China's "particularly abhorrent behavior" toward Falun Gong.  Dept. of State, Annual Report on International Religious Freedom 2000, 106th Cong., 2d Sess., xxix, xxxii (Joint Comm. Print 2000).  So has Congress.  See, *e.g.*, H. Res. 605, 111th Cong., p. 5 (2010) (condemning the Chinese Government's "campaign to persecute, intimidate, imprison, and torture Falun Gong practitioners"); see also Brief for Members of Congress et al. as *Amici Curiae* 22–26 (listing other congressional resolutions and actions condemning China's persecution of Falun Gong).  Given that both political branches have so publicly and directly condemned China's persecution of Falun Gong members, it strains credulity to say that allowing a private suit against an American company to proceed would meaningfully change the state of relations between the United States and China.

   In addition, any potential foreign-policy consequences are further reduced because neither China nor any Chinese instrumentality is a party to the case itself.  Rather, the suit

_____

   [2] National Security Council, United States Strategic Approach to the People's Republic of China 15 (2020), https://trumpwhitehouse.archives. gov/wp-content/uploads/2020/05/U.S.-Strategic-Approach-to-The-Peoples-Republic-of-China-Report-5.24v1.pdf  (archived  at  https://perma.cc/ 2PHC-HLKP).

SOTOMAYOR, J., dissenting

is against an American company and focuses primarily on its conduct in the United States. China also could have appeared in this case if it opposed it. It could have filed a brief in this case saying so, just as it did in a previous ATS case that involved China. See *Doe* v. *Qi*, 349 F. Supp. 2d 1258, 1264, 1296–1301 (ND Cal. 2004) (noting that, in an ATS suit against Chinese local-government officials, China, "through the United States Department of State, submitted a letter to this Court urging this Court not to assert jurisdiction over the instant cases"). Other foreign states have filed similar materials in other ATS cases. See, *e.g.*, *Jesner*, 584 U. S., at 271 (citing brief filed by the Hashemite Kingdom of Jordan in ATS suit against a Jordanian bank). That China has not done so here is additional evidence that this case is unlikely to aggravate U. S.–China relations.

Second, Cisco and the United States argue that this Court's decision in *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), forecloses aiding-and-abetting liability here, reading that case to permit aiding-and-abetting liability only if a statute expressly so states. *Central Bank* has minimal bearing here. It involved the Securities Exchange Act of 1934, the text of which limits liability to those who "'directly or indirectly'" engage in certain kinds of conduct. *Id.*, at 171. The Court there recognized that Congress "has taken a statute-by-statute approach to civil aiding and abetting." *Id.*, at 182. The Court reasoned that the text of that statute did not extend liability to aiders and abettors because they do not necessarily engage in the underlying activity they facilitate. *Id.*, at 176–177. That conclusion was buttressed by the fact that it was "uncertain" whether state common law supplied "a deeply rooted background of aiding and abetting tort liability." *Id.*, at 181–182, 184. Here, by contrast, the ATS does not limit liability to those who engage in certain acts. Instead, it authorizes courts to entertain suits involving a "tort . . . committed in violation of the law of nations."

10          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

§1350.  As noted above, Cisco does not dispute that liability for aiding and abetting the seven underlying violations is universally recognized in international law.  *Central Bank*'s holding about a textually distinct statute rooted in domestic law thus says little about what the ATS recognizes under international law.

Because Cisco does not dispute that *Sosa*'s first step is satisfied and has not identified a sound reason for this suit not to proceed at *Sosa*'s second step, the Court should affirm the Ninth Circuit's judgment.[3]

### III

The majority, however, is in a rush.  Not wanting to dally on niceties like binding precedent, or to confine itself to deciding the case before it, the majority casts aside *Sosa*'s two-step framework altogether.  It disclaims any future authority by any court to find additional causes of action in all cases to come, even though it declines to disturb the three implied causes of action previously recognized under the ATS.  *Ante*, at 1.  In short, it overturns *Sosa*.  In doing so, the Court brushes past the *stare decisis* factors that this

---

[3]The Ninth Circuit treated aiding-and-abetting liability as the relevant international-law norm at *Sosa*'s first step, concluding that "customary international law recognizes aiding and abetting liability as a specific and universal form of liability."  73 F. 4th 700, 718 (2023).  Arguably, however, the relevant norm for the *Sosa* analysis might be the underlying offense that Cisco allegedly aided, such as torture.  Whether aiding-and-abetting liability is available would then be assessed simply by determining the substantive breadth and scope of liability of a norm that has been sufficiently established.  See 113 F. 4th 1230, 1243 (CA9 2024) (Bumatay, J., dissenting from denial of reh'g en banc).  For example, Blackstone described slightly varying scopes of secondary liability as to each of the three offenses he identified.  See 4 W. Blackstone, Commentaries on the Laws of England 69–73 (1769).  If the majority were inclined to preserve *Sosa*'s two-step framework, and if the parties disputed *Sosa*'s first step at all before this Court, the Court could have vacated and remanded this case for the Ninth Circuit to reconsider what the relevant norm is for purposes of *Sosa*'s first step.

SOTOMAYOR, J., dissenting

Court considers when deciding whether to overturn precedent. It also slams the door in the faces of victims of horrific mistreatment without giving any reason to think that Congress, whom the Court purports to respect, would have wanted to do so. The majority errs at each turn.

### A

To begin, the majority fails to demonstrate that *Sosa* is wrong, never mind that there is the special justification needed to overturn it.

Start with the common ground: There is no dispute that the ATS contains judicially implied causes of action. Specifically, it contains implied causes of action for "'violation of safe conducts, infringement of the rights of ambassadors, and piracy.'" *Ante*, at 4 (quoting *Sosa*, 542 U. S., at 715). Those causes of action appear nowhere in the ATS's text. They instead come from authoritative accounts of international law, most notably the work of 18th century English jurist William Blackstone. See 4 W. Blackstone, Commentaries on the Laws of England 68 (1769). (Hence the moniker "Blackstone three.") As *Sosa* explained, suits alleging violations of safe conducts, infringements on the rights of ambassadors, and acts of piracy all may proceed under the ATS because Congress likely had these three offenses "in mind" when it passed the ATS, even if it did not say so expressly. 542 U. S., at 724–725.[4]

---

[4] The majority attempts to distance itself from the notion that the ATS contains implied private rights of action for the Blackstone three, saying that *Sosa* merely assumed that the Blackstone three would be actionable under the ATS. See *ante*, at 12, and n. 3. That is perplexing. *Sosa* explained at length that the First Congress did not intend to leave the ATS "lying fallow" and that Congress instead intended for at least the Blackstone three to be actionable. See 542 U. S. 692, 712–724. To the extent the majority is unsure that even the Blackstone three are actionable under the ATS, it is unclear why the majority is willing to leave the door ajar for those three causes of action but not for any others that enforce similarly well-established norms of international law.

12          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

If the ATS allows these three implied causes of action drawn from international law, then it is hard to see why it does not allow others similarly drawn from that body of law. Indeed, this is a key part of *Sosa*'s reasoning and its central holding. See *Bucklew* v. *Precythe*, 587 U. S. 119, 136 (2019) ("[J]ust as binding as [a case's] holding is the reasoning underlying it"). When Congress passed the ATS, "the accepted conception" of the common law was that federal courts, when adjudicating individual cases, were "discover[ing]" a pre-existing and "'transcendental body of law outside of any particular State'" and applying it. *Sosa*, 542 U. S., at 725. Working under that assumption, Congress omitted any specific causes of action from the ATS, see §1350, and left it to courts to draw upon the body of international law, which included the Blackstone three, and apply relevant principles in other, specific cases. *Id.*, at 724–725, 730.

Ample historical evidence corroborates *Sosa*'s account of the ATS. The First Congress passed the ATS after the Continental Congress (operating under the Articles of Confederation) "was hamstrung by its inability to 'cause infractions of treaties, or of the law of nations to be punished.'" *Id.*, at 716 (quoting J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed. 1893)). For example, on at least two occasions prior to the Constitution's ratification, foreign diplomats were assaulted on American soil. 542 U. S., at 716–717. The Continental Congress called on States to pass legislation authorizing their courts to hear cases involving violations of international law, but just one answered the call. *Id.*, at 716. Understandably offended, at least one foreign ambassador lodged a protest that was discussed during the Constitutional Convention. *Id.*, at 717. As *Sosa* explained, given the "anxieties of the preconstitutional period," it is unlikely that Congress intended for the ATS to serve only "as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, someday, authorize the creation of

SOTOMAYOR, J., dissenting

causes of action." *Id.*, at 719. Rather, Congress intended for its handiwork to have immediate effect, without further express creation of causes of action.

Contemporaneous legal sources discussing international incidents that transpired shortly after Congress passed the ATS further support *Sosa*'s holding. In 1792, Secretary of State Thomas Jefferson and Attorney General Edmund Randolph each issued an opinion addressing incidents in which Americans entered Spanish Florida and French Haiti, abducted slaves, and returned them to the United States. See T. Jefferson, Opinion on Offenses Against the Law of Nations (Dec. 3, 1792), in 24 The Papers of Thomas Jefferson 693–696 (J. Catanzariti ed. 1990) (Jefferson Opinion); E. Randolph, Opinion on Offenses Against the Law of Nations (Dec. 5, 1792), in 24 *id.*, at 702–703 (Randolph Opinion). Both agreed that federal courts could hear civil suits relating to these incidents under the ATS. Jefferson wrote that the ATS would cover any suit by "an alien . . . for a tort only," Jefferson Opinion 694 (emphasis deleted), while Randolph agreed that "damages may be recovered in the courts of the United States, under the jurisdictions established by the judicial law"—that is, under the ATS, Randolph Opinion 702. Similarly, in 1795, Attorney General William Bradford issued an opinion explaining that "Americans who had taken part in the French plunder of a British slave colony in Sierra Leone," and thus arguably breached a declaration of neutrality, "'no doubt'" could be held civilly liable "'in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States.'" *Sosa*, 542 U. S., at 721 (quoting 1 Op. Atty. Gen. 57, 59).

Taken together, the opinions of these early American statesmen confirm that the ATS was understood to allow civil suits for violations of international law even without any express causes of action. They also support the

14          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

conclusion that the ATS was not understood to be limited
to the Blackstone three: None of these early incidents in-
volved safe conducts, ambassadors, or piracy at sea.  In-
stead, they involved violations of other international-law
principles, including neutrality and prohibitions on "plun-
der" and "robbery."  2 E. de Vattel, The Law of Nations, ch.
VI §78 (J. Chitty ed., 6th ed. 1844); see *Franchise Tax Bd.
of Cal.* v. *Hyatt*, 587 U. S. 230, 239 (2019) (describing de
Vattel as "the founding era's foremost expert on the law of
nations").  As *Sosa* did, the founding generation thus un-
derstood the ATS to leave the door open to other causes of
action rooted in the law of nations beyond the Blackstone
three.

The majority does not explain why implied causes of ac-
tion for the Blackstone three are permissible but implied
causes of action for any other norm of international law,
which either existed in 1791 or exist today, are not.  The
majority instead turns down a different road, one paved not
with the opinions of the Court, which are the law, but with
the opinions of individual Justices, which are not.  Despite
claiming that its "starting point is *Sosa*'s key insight," the
majority veers off with its very next paragraph.  *Ante*, at 7.
It observes that Justice Scalia, who concurred in part and
concurred in the judgment in *Sosa*, "would have stopped"
with just the Blackstone three, *ante*, at 7, and then in the
next paragraph, cites four more individual opinions ex-
pressing sympathy for that view, but none of which was the
controlling majority opinion.  See *ante*, at 8 (citing *Jesner*,
584 U. S., at 274 (THOMAS, J., concurring); *id.*, at 280–293
(GORSUCH, J., concurring in part and concurring in judg-
ment); *Nestlé*, 593 U. S., at 634–640 (opinion of THOMAS, J.);
*id.*, at 658 (ALITO, J., dissenting)).

These five opinions, however, are not, and never have
been, the law.  The *Sosa* majority expressly rejected the call
to stop at the Blackstone three, dismissing Justice Scalia's
position as "particularly unconvincing in light of what we

SOTOMAYOR, J., dissenting

know about congressional understanding bearing on this issue." 542 U. S., at 729–730. Nor did any of the subsequent opinions garner a majority, as the Court in each case rejected liability under the ATS on narrower grounds than the separate writings advocated. See *Nestlé*, 593 U. S., at 634 (rejecting extraterritorial application of the ATS); *Jesner*, 584 U. S., at 270–272 (holding that *Sosa*'s second step counseled against extending ATS liability to foreign corporations). To say something three times (or five) does not make it true. See L. Carroll, The Hunting of the Snark (1876).

Setting that aside, the majority distills two points from its tour through separate writings: (1) judicial authority to recognize causes of action is "'narrow'" because ATS suits "by their nature implicate foreign policy"; and (2) "the power to create causes of action belongs to Congress." *Ante*, at 8–9.

Neither point explains why it respects Congress to recognize causes of action for the Blackstone three but not for other international-law principles that are sufficiently similar to those causes of action. To the extent the majority thinks that the Blackstone three are uniquely supported by the historical record, that is doubtful for the reasons given above. See *supra*, at 13–14. There also is no indication that Congress intended to "tra[p]" the ATS "in amber." *United States* v. *Rahimi*, 602 U. S. 680, 691 (2024).[5]

In any event, this Court already resolved the majority's objections in *Sosa* itself. First, *Sosa* explained that foreign-policy concerns can arise from the failure to provide

_____

[5] The majority's limit is also unfaithful to Blackstone. Blackstone recognized secondary liability as part of the substantive offenses he identified. See 4 Blackstone, Commentaries on the Laws of England, at 69–72. Thus, even if Blackstone supplied the authoritative account of suits available under the ATS, that would still permit liability to extend beyond just those who principally commit the three offenses Blackstone identified.

16          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

remedies for international-law violations just as they can arise from the imposition of liability for such violations. The founding generation was deeply concerned with foreign tensions resulting from "the Continental Congress's incapacity to deal with," and States' failures to provide remedies for, international-law violations, especially when an American defendant was involved. 542 U. S., at 716–718. The ATS was a direct response to those "anxieties of the preconstitutional period." *Id.*, at 719. Indeed, the incidents discussed above all came to the Federal Government's attention because foreign nations complained to the United States about them. See, *e.g.*, Jefferson Opinion 693 (noting complaints from Spanish and French diplomats); 1 Op. Atty. Gen., at 58 (referring to complaint submitted by British minister).

Today, too, providing an American forum for international-law violations can improve foreign relations, as evidenced by the fact that foreign sovereigns have sometimes filed briefs expressing support for ongoing ATS litigation. See, *e.g.*, *In re Estate of Ferdinand Marcos Hum. Rights Litigation*, 94 F. 3d 539, 547 (CA9 1996) (noting that the Philippines "urged" an ATS "suit to proceed in American courts" because "'relations may well be improved if Filipino citizens see that justice is available in U. S. courts'"); *Sarei* v. *Rio Tinto, PLC*, 671 F. 3d 736, 756 (CA9 2011) (noting that Papua New Guinea "expressly urged" that an ATS aiding-and-abetting case "'be heard by courts in the United States'" because it would not "'adversely affec[t] any relations between [Papua New Guinea] and the United States'"), judgt. vacated, 569 U. S. 945 (2013). Former United States Ambassadors-at-Large for War Crimes also explain that authorizing aiding-and-abetting liability under the ATS "is consonant with U. S. foreign policy interests" in light of the United States' "consisten[t] promot[ion of] aiding and abetting as an essential means for holding perpetrators of international crimes to account." Brief for Former U. S.

SOTOMAYOR, J., dissenting

Ambassadors-at-Large for War Crimes Issues/Global Crim-
inal Justice et al. as *Amici Curiae* 10, 12; see *id.*, at 9, 11–
29 (describing the United States' role in supporting aiding-
and-abetting liability in proceedings before the Nuremberg
Tribunal and other international criminal courts).

Given that there are strong foreign-policy interests on
both sides of the scale, *Sosa* correctly rejected the argument
that fear of "adverse foreign policy consequences" should
categorically preclude judicial involvement in this area.
542 U. S., at 728. Instead, although it stressed that courts
must act "with great caution" when finding implied causes
of action, *Sosa* left the door open to doing so. *Id.*, at 728,
731.[6]

Second, *Sosa* also fully addressed the majority's charge
that, according to modern legal sensibilities, Congress, not
courts, should create causes of action. Like today's Court,
the *Sosa* Court was well aware that "this Court has recently
and repeatedly said that a decision to create a private right
of action is one better left to legislative judgment in the
great majority of cases." *Id.*, at 727; see *ante*, at 9. Even so,
*Sosa* explained that the First Congress, which passed the
ATS, did not see things the same way and that it would be
"particularly unconvincing" to impose present-day legal
theories on a Congress from two centuries ago. 542 U. S.,
at 730. It would be "unreasonable," *Sosa* continued, to fault
Congress for failing in 1791 to anticipate the prevailing le-
gal fashion two centuries down the line and to calcify a stat-
ute that Congress intended to be flexible. *Ibid.*

For all these reasons, *Sosa* correctly held that courts may
find implied private rights of action cognizable under the
ATS, so long as they proceed with "great caution" and do
not recognize causes of action dissimilar to the Blackstone

———————

[6]The majority urges "judicial humility" when it comes to matters of
foreign affairs. *Ante*, at 9, n. 1. True judicial humility, however, is fol-
lowing precedent and respecting the wisdom of the jurists who precede
us.

18          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

three: that is, those "for violations of any international law norm with less definite content and acceptance . . . than the historical paradigms familiar when [the ATS] was enacted." *Id.*, at 728, 732.[7]

B

Even if *Sosa* was wrongly decided, that still would not justify the result the majority reaches today. The rule of *stare decisis*, or "[a]dherence to precedent," this Court has explained, is "'a "foundation stone of the rule of law,"'" *Kisor* v. *Wilkie*, 588 U. S. 558, 586 (2019). This "important doctrine . . . ensure[s] that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). It also "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Id.*, at 265–266. Overturning a prior decision therefore requires "special justification"; "it is not alone sufficient that we would decide a case differently now than we did then." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 455–456 (2015).

The majority, however, nowhere mentions *stare decisis*. Indeed, the Court's opinion does not even state the necessary consequence of what it decides today: that *Sosa* is overruled. Disturbingly, this is not the first time in recent years that the Court has been "willing to overrule precedent

---

[7] The majority claims that permitting courts to find implied causes of action in this way "would have confounded the First Congress." *Ante*, at 12, n. 3. Far from it: For all the reasons explained above and in *Sosa*, the First Congress expected courts to find causes of action that permit plaintiffs to recover damages for violations of norms of international law like the Blackstone three. What would have "confounded the First Congress" instead is today's decision to override those expectations and engraft a modern hostility to implied rights of action totally inconceivable to the First Congress and the founding generation.

SOTOMAYOR, J., dissenting

without even acknowledging it is doing so, much less providing any special justification." *Jones* v. *Mississippi*, 593 U. S. 98, 144 (2021) (SOTOMAYOR, J., dissenting) (describing the Court's implicit overruling of *Miller* v. *Alabama*, 567 U. S. 460 (2012), and *Montgomery* v. *Louisiana*, 577 U. S. 190 (2016)). "How low this Court's respect for *stare decisis* has sunk." 593 U. S., at 144.

The majority's apparent disregard for *stare decisis* is particularly lamentable here because this Court has long held that *stare decisis* has "special force" as to decisions interpreting congressional statutes. *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172 (1989). That is because Congress, not this Court, has the primary responsibility to "correct any mistake[s]" in this Court's statutory decisions. *Kimble*, 576 U. S., at 456. Accordingly, this Court has consistently required a "superspecial justification to warrant reversing" a statutory precedent. *Id.*, at 458. This Court has applied this heightened standard "even when a decision has," like *Sosa*, "announced a 'judicially created doctrine' designed to implement a federal statute." 576 U. S., at 456.

When deciding whether to overturn a decision like *Sosa*, this Court will "most often" consider "subsequent legal developments—'either the growth of judicial doctrine or further action taken by Congress'—that have removed the basis for a decision." 576 U. S., at 458. Here, however, this "primary reason" for overruling statutory precedents, *Patterson*, 491 U. S., at 173, is completely absent. As discussed above, this Court's modern push to limit implied causes of action was well underway by the time *Sosa* was decided. See *supra*, at 17.

The majority says that "[s]ince *Sosa* was decided, we have firmly committed to the view that judicially created causes of action offend the separation of powers in almost every circumstance.'" *Ante*, at 10. It relies primarily on cases concerning not implied causes of action under the ATS, but cases from this Court's *Bivens* jurisprudence. See *ante*, at

20                CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

10 (citing, among others, *Egbert* v. *Boule*, 596 U. S. 482 (2022); *Ziglar* v. *Abbasi*, 582 U. S. 120 (2017)). Those cases are far afield: They involved implying causes of action under the Constitution, not the ATS. There are, of course, many differences between the Constitution and the ATS, chief among which is that Congress passed the ATS specifically to furnish a path for plaintiffs to recover monetary damages. See *Sosa*, 542 U. S., at 724. Setting those differences aside, by the time this Court decided *Sosa* in 2004, it was already "firmly committed," *ante*, at 10, to limiting implied rights of action. Indeed, years before *Sosa*, this Court had already "sworn off " the habit of implying private causes of action outside the ATS. *Alexander* v. *Sandoval*, 532 U. S. 275, 287 (2001); see *Sosa*, 542 U. S., at 727 (citing *Alexander*). Even so, *Sosa* confronted that issue and held that courts may find implied rights of action under the ATS. The cases the majority cites from the *Bivens* context therefore did not unearth some new objection not considered by the *Sosa* Court, "remov[e] the basis for [*Sosa*]," *Kimble*, 576 U. S., at 458, or render *Sosa* "irreconcilable with competing legal doctrines or policies," *Patterson*, 491 U. S., at 173.

Nor has Congress amended the ATS or passed other legislation that undercuts *Sosa*'s holding. *Sosa* itself "welcome[d] any congressional guidance" over the interpretation of the ATS and how courts proceed when defining causes of action. 542 U. S., at 731. It also reiterated that "Congress may" close the door to new causes of action "at any time (explicitly, or implicitly by treaties or statutes that occupy the field), just as it may modify or cancel any judicial decision so far as it rests on recognizing an international norm as such." *Ibid*. Yet Congress has done none of this in response to *Sosa*.[8]

—————

[8] The majority suggests that the TVPA displaced *Sosa*. *Ante*, at 10–11. Congress, however, passed the TVPA in 1991, 13 years before this Court

Cite as:  609 U. S. \_\_\_\_ (2026)          21

SOTOMAYOR, J., dissenting

The other circumstance in which this Court will some-times overturn a statutory precedent is if its standard has "prove[n] unworkable." *Kimble*, 576 U. S., at 459.  Here, there is no reason to think that is true of *Sosa*'s two-step framework.  No one argues before this Court that *Sosa*'s steps are unclear or hard to apply.  Instead, Cisco argues that *Sosa* and the ATS have allowed causes of action to pro-liferate, ensnaring defendants and courts in litigation.  See Brief for Petitioners 26.

No evidence supports Cisco's worries.  Federal courts have been restrained in recognizing new causes of action under *Sosa*.  One study found that, as of 2022, just 300 ATS suits had ever been filed in federal courts.  C. Ewell, O. Hathaway, & E. Nohle, Has the Alien Tort Statute Made a Difference?: A Historical, Empirical, and Normative As-sessment, 107 Cornell L. Rev. 1205, 1240 (2022) (Ewell). Fifty-two cases succeeded, and of the 248 cases that were dismissed, over one-third of them were dismissed at *Sosa*'s first step because the plaintiffs had not identified an action-able violation of international law to begin with.  Ewell 1241.

––––––––––

decided *Sosa*.  It is bizarre to say that a statute that predates *Sosa* now undercuts *Sosa*'s holding.  In any event, rather than being an "'alterna-tive remedial structure,'" *ante*, at 10–11, that displaces *Sosa*, the TVPA indicates Congress's approval of implied rights of action under the ATS. Before *Sosa*, the Second Circuit had held that courts may imply private rights of action under the ATS for torture.  See *Filartiga* v. *Pena-Irala*, 630 F. 2d 876, 877–878 (1980).  As I have previously explained, Congress was well aware of *Filartiga* and passed the TVPA to "supplement the ATS" by extending a civil remedy to U. S. citizens who cannot sue under the ATS.  *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 316 (2018) (dissenting opinion).  As the congressional Committee Reports noted, the ATS was intended to "'remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary interna-tional law.'"  *Sosa*, 542 U. S., at 728 (quoting H. R. Rep. No. 102–367, pt. 1, p. 4 (1991)); see also *Jesner*, 584 U. S., at 316 (opinion of SOTOMAYOR, J.) (discussing this legislative history).

22          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

Two observations follow from this study. First, there is no real reason to think that ATS suits are clogging federal courts' dockets, as 300 cases across multiple centuries reflect a tiny fraction of the hundreds of thousands of civil cases that are filed in federal courts each year.[9] Second, this Court's cases narrowing ATS liability have had a significant, and effective, role in reining in federal courts and controlling the proliferation of implied causes of action for violations of international law. For example, the number of filed ATS cases fell precipitously after this Court held that the ATS does not apply extraterritorially. Ewell 1237–1238 (discussing *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108 (2013)). Putting these points together, there is no reason to think that *Sosa*'s framework has become, or is at risk of becoming, unmanageable.[10]

Again, the majority largely skips over the *stare decisis* analysis and prefers instead to decree that Justice Scalia was right in *Sosa* after all. *Ante*, at 7–12. In so doing, the majority forgets that while creating causes of action may be a task primarily for Congress, so too is correcting erroneous interpretations of statutes. See *Kimble*, 576 U. S., at 460. In nonetheless reaching out to correct a perceived error in *Sosa*, the Court does not honor the constitutional division of labor between Congress and this Court. Instead, it

---

[9] See United States Courts, Federal Judicial Caseload Statistics 2025 (2025), https://www.uscourts.gov/data-news/reports/statistical-reports/federal-judicial-caseload-statistics/federal-judicial-caseload-statistics-2025 (archived at https://perma.cc/MHE5-SXWX) (reporting 271,802 new civil filings in federal district court in 2025).

[10] The majority notes that some ATS suits have resulted in settlements in which plaintiffs and defendants have agreed to end litigation and compensate the plaintiffs in "'multimillion-dollar'" suits. See *ante*, at 11, n. 2. The majority seems to suggest that somehow these settlements are objectionable, but there is no reason to think that voluntary agreements to compensate victims of heinous conduct are inherently unfair or otherwise undesirable.

SOTOMAYOR, J., dissenting

disrespects it. Proper respect for Congress should have led to a different outcome today.

Moreover, even if Justice Scalia did get it right in 2004, "[l]ost arguments are not grounds to overrule a case." *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 352 (2023) (SOTOMAYOR, J., dissenting). "When proponents of [previously rejected] arguments, greater now in number on the Court, return to fight old battles anew, it betrays an unrestrained disregard for precedent." *Id.*, at 352–353. That is exactly what the majority again exhibits today.

C

The majority wraps up its discussion of *Sosa* by asserting that "it is hard to see how correcting *Sosa*'s unfulfilled prediction would upset reliance interests" because "it is a stretch to believe that we ever would have" found an implied right of action under *Sosa. Ante*, at 11. The majority, however, overlooks the 107 other federal courts. Many of them fulfilled this Court's prediction by finding implied causes of action under the ATS in individual cases, just as the First Congress intended. Those courts were not "'indulg[ing a] fiction.'" *Ibid.* Rather, they were dutifully applying this Court's decision in *Sosa*, and their decisions are proof that *Sosa* "'operated in practice.'" *Ante*, at 11. It is therefore unclear what the majority means when it says that *Sosa*'s promise went unfulfilled, or that no one, not even the plaintiffs who sued under the ATS, was entitled to rely on it.

What is clear is that the majority today forecloses future reliance on *Sosa* and shuts the courthouse doors to almost any claimed violation of international law under the ATS. That includes torture. See, *e.g.*, *Filartiga* v. *Pena-Irala*, 630 F. 2d 876, 878 (CA2 1980) (ATS suit brought by plaintiff alleging that his son had been kidnapped and tortured to death in retaliation for the plaintiff's political beliefs). It

SOTOMAYOR, J., dissenting

includes forced labor.  See, *e.g.*, *Licea* v. *Curacao Drydock Co.*, 584 F. Supp. 2d 1355, 1359 (SD Fla. 2008) (ATS suit alleging that the defendant trafficked Cubans to Curacao, held them in captivity, and forced them to work repairing ships and oil platforms).  It also includes perhaps the most universally condemned crime in the modern era: genocide. See, *e.g.*, *Kadic* v. *Karadzic*, 70 F. 3d 232, 236–237 (CA2 1995) (ATS suit alleging "brutal acts of rape, forced prostitution, forced impregnation, torture, and summary execution, carried out by Bosnian-Serb military forces as part of a genocidal campaign").  "Like the pirates of the 18th century," whose conduct so concerned Blackstone and the First Congress, "today's torturers, slave traders, and perpetrators of genocide are '*hostis humani generis*, an enemy of all mankind.'"    *Nestlé*, 593 U. S., at 647 (opinion of SOTOMAYOR, J.).

As to each of these offenses, as to each of these enemies of mankind, the majority decides that there is simply no way that a suit could possibly proceed without offending Congress.  Noticeably absent from the majority's analysis is any evidence that Congress would be offended by these suits.  Of course, there may be reasons why allowing an individual ATS suit to proceed would be unwise.  That possibility, however, should be addressed on a case-by-case basis.  Indeed, that option was available in this very case. Even though the analysis of the dissenting judge below was mistaken for the reasons given above, see *supra*, at 5–10, it at least applied *Sosa* and concluded that allowing this specific suit to proceed would not be an appropriate exercise of judicial discretion, see 73 F. 4th, at 748–751.  The possibility that one case should not be allowed through the door is no reason to weld the door shut and lock out all others.

## IV

The majority also errs by holding that the TVPA does not allow plaintiffs to sue for the aiding and abetting of torture.

Cite as: 609 U. S. ____ (2026)            25

SOTOMAYOR, J., dissenting

The TVPA states that "[a]n individual who . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual."   Note following 28 U. S. C. §1350 (Establishment of Civic Action) (§1350 note).   This Court has already acknowledged that this language extends beyond those who "personally execute the torture." *Mohamad* v. *Palestinian Authority*, 566 U. S. 449, 458 (2012). This Court has also explained that aiding and abetting requires that "the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Twitter, Inc.* v. *Taamneh*, 598 U. S. 471, 493 (2023).

Putting the terms "subjects" and "aiding and abetting" together yields a simple answer.  In ordinary meaning, a person "subjects" another to torture if he "consciously and culpably 'participate[s]' in" the torture "so as to help 'make it succeed.'" *Ibid.*  Imagine an individual who rounds people up and delivers them to a black site to be tortured by another person.  Or a company that sets up the torture chamber with all the necessary tools.  Or an informant who provides sensitive information about the victim so that another person can tailor the torture to the victim's weaknesses. None of these actors conducted the torture themselves, but they have all "subjected" those people to torture by "culpably 'participat[ing]' in" it and helping to "'make it succeed.'" *Ibid.*

Dictionary definitions reinforce this understanding.  Dictionaries define "subjects" to mean "to cause to undergo or submit to" or to "expose."  Webster's Third New International Dictionary 2275 (1993) (capitalization modified); see American Heritage Dictionary 807 (3d ed. 1992) ("[t]o expose to something," "[t]o cause to experience").  A person plainly causes, exposes, or otherwise makes someone submit to torture when she "consciously and culpably 'participat[es]' in" it.  *Twitter*, 598 U. S., at 493; see also Restatement (Second) of Torts §876, Comment *d* (1977) (explaining that, under the common law, aiding and abetting requires

26          CISCO SYSTEMS, INC. *v.* DOE

SOTOMAYOR, J., dissenting

proving the "assistance is a substantial factor in causing the resulting tort").

The majority's narrow interpretation of the word "subjects" is also incompatible with another form of secondary liability that all agree is covered by the TVPA: command responsibility. See Brief for Petitioners 41; Brief for United States as *Amicus Curiae* 31–32. Command responsibility holds superior officers vicariously liable for the actions of their subordinates. It generally requires showing that the superior "knew, or should have known," that subordinates had or were about to commit torture and "failed to take all necessary and reasonable measures to prevent" it. *Chavez* v. *Carranza*, 559 F. 3d 486, 499 (CA6 2009); see *Mohamad*, 566 U. S., at 458 (approvingly citing *Chavez*). It requires showing neither "proximate cause" nor that the officer participated in the torture. See *Chavez*, 559 F. 3d, at 499. That the TVPA extends such attenuated liability to someone who did not participate in torture suggests that it also holds liable someone who culpably participates in torture, such as someone who provides tools to the torturer. Contra, *ante*, at 14, n. 4.

Finally, the majority's reliance on *Central Bank* is misplaced. As discussed above, that case interpreted a statute imposing liability on someone who "'directly or indirectly'" engaged in proscribed acts. 511 U. S., at 176. That language is narrower than the TVPA's operative language that extends liability to anyone who "subjects" another to torture. Yet by extending *Central Bank* in this way, the majority effectively creates a magic-words test and "impose[s] a 'clarity tax' on Congress by demanding that it speak unequivocally if it wants to" impose aiding-and-abetting liability. *Biden* v. *Nebraska*, 600 U. S. 477, 508 (2023) (BARRETT, J., concurring) (quoting J. Manning, Clear Statement Rules and the Constitution, 110 Colum. L. Rev. 399, 403 (2010)). Even in contexts where this Court requires a clear statement, like waivers of sovereign immunity, this Court has

SOTOMAYOR, J., dissenting

emphasized that "'no magic words are required'" because the "fact that Congress chose to use certain language" in one statute "hardly means it was 'foreclose[d] . . . from using different language to accomplish th[e] same goal.'" *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 52 (2024); see *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 153 (2013) (emphasizing Congress need not "incant magic words" to make clear that a statutory limitation is jurisdictional). The majority offers no reason why magic words would be required in this context.

At bottom, the TVPA expressly authorizes victims of torture to sue any "individual who . . . subjects [them] to torture." §1350 note. Because the plain text of this statute includes individuals who aid and abet the victim's torture, I would affirm the Ninth Circuit's judgment on this score as well.

V

The Court's decision today is yet another notch in its belt, unabashedly remaking the law in its preferred image. The majority jettisons two decades of settled precedent and breathes new life into two decades of rejected legal theories. It does all this in the name of respecting Congress and the separation of powers. Yet in fixating on the separation of powers, the majority ignores the foundations of its own and shakes the public's confidence in the stable and predictable development of the law. Because resolving this case did not require inflicting these wounds, I respectfully dissent.